Reed, Justice {Ret.),
sitting by designation, delivered the opinion of the court:
Plaintiff brings this action for an income tax refund for the fiscal year ending June 30,1959. It claims that, as a real estate board, it is exempt from the payment of income taxes under § 501(c) (6) of the Internal Revenue Code of 1954, 26 U.S.C. § 501 (c) (6) (1958 ed.), which confers an exemption upon:
“(6) Business leagues, chambers of commerce, real-estate boards, or boards of trade, not organized for profit and no part of the net earnings of which inures to the benefit of any private shareholder or individual.” (Emphasis added.)
The Evanston-North Shore Board of Realtors is an Illinois not-for-profit corporation whose 581 members consist pri *684 marily of licensed real estate brokers and salesmen in the Evanston and North Shore areas of suburban Chicago. The purposes of the Board, according to its Articles of Incorporation, are in part to maintain the responsibility of its members in their duty to the public, to enforce fair dealing, to foster fellowship among its members, and to support such governmental regulation as is designed to advance the interests of real property owners. The activities by which the Board strives to fulfill these ends include the operation of a member selection program to screen and educate new applicants for membership, the arbitration of disputes between members, the enforcement of a Code of Ethics promulgated by the National Association of Beal Estate Boards, participation in the adoption and enforcement of local zoning ordinances and other municipal regulation of matters relating to real estate, and the support of various campaigns to maintain and improve our cities.
So long as these unquestionably were the primary activities of the Board, plaintiff's right to an exemption under § 501 (c) (6) was recognized by the Internal Revenue Service. However, in 1953 the Board, as have many other realty boards throughout the country, added to its activities the operation of a “Cooperative Listing Service,” commonly termed a “multiple listing system” or “multiple listing service.” In 1959, the Internal Revenue authorities issued Revenue Ruling 59-234,1959-2 Cum Bull. 149, in which it was concluded that a real estate board the primary purpose or activity of which is the operation of a multiple listing system, is not entitled to exempt status under the statute and the interpretative regulation; plaintiff subsequently was notified that its exemption was to be terminated as of June 30,1958.
Plaintiff’s challenge to the termination of its exemption rests on two grounds. First, it contests the basis of Revenue Ruling 59-234, and argues that a nonprofit corporation operating a multiple listing service as its primary activity is entitled to exemption under § 501(c) (6). Alternatively, plaintiff asserts that it should be tax free because the operation of its multiple listing service is not its primary activity but is only incidental to its other primary objectives.
*685 A multiple listing system is a means by which the participating real estate dealers share listings which each has obtained for the sale of realty. Participation in the service operated by the plaintiff is mandatory for all Board members whose primary business is the sale of residential property. The operation of the plaintiff’s system is more fully described in our Findings 28-83. It will do for these purposes to point out that when a real estate broker participating in the service enters a contract to act as agent for the sale of property, he forwards certain information regarding the property to the Board office; the Board duplicates this information and distributes it, together with a photograph of the property, to all other participating brokers. Thereafter, a date is arranged on which all brokers may inspect the listed property. If a broker other than the listing broker effects the sale of the property, the commission is divided between him and the listing broker.
The listing service is financed in the following manner. In addition to a fixed monthly fee of $7 per member brokerage office, a listing broker is charged $10 each time he lists a piece of property. If he effects the sale himself, he is charged an additional $2; if a sale is effected cooperatively through another member broker, the listing broker pays the same additional $2, and the selling broker is also charged a $12 fee. The Board does not, however, segregate these funds from those which it obtains from other sources.
Turning to the applicable provisions of law, section 501(c) (6) is set out above. The regulation to the statute further provides that in order for an organization to qualify for an exemption, its activities must be “directed to the improvement of business conditions of one or more lines of busiiiess as distinguished from the performance of particular services for individual persons,” and it must not “engage in a regular business of a kind ordinarily carried on for profit.”[1] This regulation was first adopted in 1929, *686 Treas. Reg. 74, Art. 528, shortly after real estate boards had been added to the coverage of the statute, 45 Stat. 813, and the regulation has remained unchanged through repeated statutory reenactments. As both parties urge, the regulation must now be treated as having the force of law. Automotive Electric Assn. v. Commissioner, 168 F. 2d 366, 367 (C.A. 6, 1948); Apartment Operations Assn. v. Commissioner, 136 F. 2d 435 (C.A. 9,1943) ; see Helvering v. Winmill, 305 U.S. 79, 83 (1938).
We may concede to the plaintiff that the operation of a multiple listing system is not a business which is normally carried on for profit. The Government argues to the contrary based on the fact that there are more than 100 multiple listing systems in the country which are organized as separate entities. But it does not follow that such organizations are operated for a profit. To the contrary, so far as appears, all of the independent systems are affiliated with and controlled by local real estate boards; none are privately owned corporations organized for profit. Plaintiff’s right to an exemption cannot be defeated on this ground. Compare Oregon Casualty Assn. v. Commissioner, 37 B.T.A. 340 (1938), with Retailers Credit Assn. v. Commissioner, 90 F. 2d 47 (C.A. 9, 1937).
Nonetheless, if the multiple listing service is operated primarily for individual members as a convenience and economy in the conduct of their respective businesses, rather than for *687 the improvement of business conditions within the real estate business generally, as was determined in Eevenue Euling 59-234, the operation of the service is not an activity warranting an exemption under the statute.
“The numerous subdivisions of . . . [the predecessor to § 501] and the corresponding provisions in the earlier acts, specify organizations which, in the great majority of instances, are evidently granted exemption because of the benefit to be derived by the public from their activities. Cf. Trinidad v. Sagrada Orden, 263 U.S. 578, 581, 44 S. Ct. 204, 68 L. Ed. 458. There is reason why these should be favored, but none is apparent for exempting an association which merely serves each member as a convenience or economy in his business.” Produce Exchange Stock Clearing Assn. v. Helvering, 71 F. 2d 142, 143 (C.A.2, 1934).
See Apartment Operations Assn. v. Commissioner, 136 F. 2d 435, 436 (C.A. 9, 1943); Growers Cold Storage Co. v. Commissioner, 17 B.T.A. 1279, 1283 (1929).
To determine whether a multiple listing service is operated primarily for the benefit of individual realtors or for the benefit of real estate business generally is not without difficulty, since the interests of both and of the public as well are served by a system which facilitates the exchange of real property. Indeed, Eevenue Euling 59-234 is based upon the assumption that the purposes of a multiple listing service are:
“ (a) to assist members of the board in rendering better service to the public by creating a broader and more active market for real estate; (b) to stimulate and facilitate the transaction of business between members of the board through cooperation and exchange of exclusive listings; (c) to provide a medium through which real estate may be merchandised more efficiently and expeditiously to the advantage of both buyer and seller; and (d) to encourage realtors to uphold high standards of business practice and to further educate them in adhering to the principles of the Eealtors’ Code of Ethics.”
And a publication of the National Association of Eeal Estate Boards states simply that a multiple listing system is “a medium through which real estate may be merchandized efficiently and expeditiously to the advantage of the buyer and the seller and which will produce a greater profit to the *688 Realtor.” Moss, Multiple Listing Practice and Procedures 9 (Secretaries Council, National Association of Real Estate Boards, 1950).
Fortunately for the national welfare, though perhaps unfortunately for tax law, this is not an uncommon situation. The activities of many trade groups are of benefit to both the public and the trade in general, and to individual members of the trade. As the Tax Court noted in National Leather & Shoe Finders Assn. v. Commissioner, 9 T.C. 121, 126 (1947), “it can hardly be supposed that individuals would often join organizations without the expectation of receiving some personal benefits therefrom.” Hence, the courts have often been called upon to determine whether the primary purpose and effect of an organization’s activities is to benefit the group or the individual, and upon such a determination has hinged the fate of the exemption. Compare Automotive Electric Assn. v. Commissioner, 168 F. 2d 366 (C.A. 6, 1948), with National Leather & Shoe Finders Assn. v. Commissioner, 9 T.C. 121 (1947).
In considering the facts of this case, we find several factors which require the conclusion that plaintiff’s multiple listing system operates most immediately to the benefit of the individual participating realtors. First, and most important, is the fact that the fees charged for the listing service are in approximate proportion to the benefits received by each realtor. A broker pays a fee for each piece of property which he lists, which listing is circulated to all other listing brokers, any of whom may sell the property and thus earn a commission for the listing broker. A like fee is paid by any other broker who is able to sell the property, and who thereby earns a commission on the sale. When each member contributes in proportion to what he receives, it is a strong indication that the benefits received are not, as plaintiff contends they are, “inherently group benefits.” See National Chiropractic Assn. v. Birmingham, 96 F. Supp. 874 (N.D.Iowa, 1951); General Contractors' Assn. v. United States, 202 F. 2d 633 (C.A. 7, 1953); Jockey Club v. United States, 133 Ct. Cl. 787, 137 F. Supp. 419, cert. denied, 352 U.S. 834 (1956); Credit Managers Assn. v. Commissioner, 148 F. 2d 41 (C.A. 9, 1945); Durham Merchant's Assn. v. United States, *689 34 F. Supp. 71 (M.D.N.C., 1940); Fort Worth Grain & Cotton Exchange v. Commissioner, 27 B.T.A. 983 (1933); Growers Cold Storage Co. v. Commissioner, 17 B.T.A. 1279 (1929).
Second, there is also the consideration, upon which the Government places great stress, that participation in the multiple listing service is limited to members of the Board. This fact does provide some indication that the service is not designed to serve the real estate business generally, Park West-Riverside Associates v. Commissioner, P.H. B.T.A. Memo. Dec. ¶ 39,251 (1939), aff’d, 110 F. 2d 1022 (C.A. 2, 1940), although it may be that the limitation is best explained by the necessities of administering and enforcing the rules and procedures of the listing service. Moreover, to place too great reliance on this factor would confront taxpayers with a real dilemma. For if the service were made available to nonmembers of the Board, the inference would be available that the Board was seeking to earn profits from nonmembers which would inure indirectly to the benefit of its members, see American Automobile Assn. v. Commissioner, 19 T.C. 1146 (1953); Texas Mobile Home Assn. v. Commissioner, P.H. Memo T.C. ¶ 62,095 (1962), another ground upon which exemption could be denied.
Third, we take note of the manner in which the listing service has been regarded by the National Association of Real Estate Boards. In a brief filed with the Internal Revenue Service in October, 1956, by Mr. George Ellis, the Comptroller and Consultant for the National Association, speaking in part on plaintiff’s behalf, it was conceded that “[t]he so-called multiple listing services operated outside and independent of a real estate board, are in fact, nothing more than a cooperative sales department of a purely business operation.” See Finding 16. In a 1951 issue of the “Multiple Listing Digestaire” (see Finding 35), the National Chairman of Multiple Listing for the Secretaries Council reported:
“Never before in the history of selling has a selling service of this magnitude been offered to the property owner and from the experience of realty boards throughout the country which have used this same service. A great proportion of listings filed with the organization are sold. It is estimated that the average individual real estate *690 broker cannot expect to sell more than 1% of the listings he receives; whereas this cooperative service has consistently been instrumental in selling 30-45% of the listings filed.” Multiple Listing Digestaire 1 (3d Quarter, 1951).
An article in a later issue pointed out that multiple listing is not a perfect service, but “should be regarded as just one of the sales tools” in the realtor’s office. Multiple Listing Digestaire 9 (Sept., 1952). Like additional statements could be extracted from the pages of the Digestaire, 19 issues of which were introduced in evidence in this case. Plaintiff of course is not bound by any such statements. Nevertheless, evidence that the industry itself regards the listing service as a “sales tool” at the disposal of the individual realtors is not without significance.
Finally, there is a particularly compelling analogy between the operation of a multiple listing service and of a stock or commodity exchange. Both are means of bringing buyers and sellers together to facilitate the sale of property. Both are supported by the brokers who earn commissions by arranging sales of the property. Both provide a genuine benefit to persons desirous of buying and selling property and to the brokers who deal in such property.[2] Since 1925 the regulations have expressly denied stock exchanges exempt status. T.D. 3746, IV-2 Cum. Bull. 77; see Treas. Reg. 1.501(c) (6)-1. And see Produce Exchange Stock Clearing Assn. v. Helvering, 71 F. 2d 142 (C.A. 2, 1934). We see no distinction between the exchange and the multiple listing *691 service which would explain why the balance struck in the case of the former, in favor of taxability, should not govern in the case of the latter.
Hence, we sustain the determination of the Bevenue Service that the operation of plaintiff’s multiple listing system cannot be regarded as directed to the improvement of business conditions in the real estate market within the meaning of the regulations, but rather constitutes the performance of a particular service for brokers participating in the service.
Nonetheless, it is true that an organization whose principal purpose and activity is such as to justify exemption does not lose its exempt status by engaging in incidental activity which standing alone would be subject to taxation. Retailers Credit Assn v. Commissioner, 90 F. 2d 47 (C.A. 9, 1937); Associated Industries of Cleveland v. Commissioner, 7 T.C. 1449, 1467 (1946); cf Trinidad v. Sagrada Orden de Predicadores, 263 U.S. 578 (1924). Plaintiff’s second contention is that it is entitled to an exemption for this reason — because the operation of its multiple listing system is only incidental to its other activities, which would otherwise entitle it to an exemption. However, the facts of this case do not permit such a conclusion.
In 1948 the plaintiff had one employee who was its executive secretary. At the time of the trial of this action, December 5, 1961, the plaintiff had five full-time employees and one part-time employee. It is a reasonable inference from the entire record that the increase in the number of employees was due in large measure to its operation of the multiple listing service. Of the Board’s $94,652.77 gross income for the fiscal year ending in June, 1956,[3] $57,381.00, or 61%, was derived from the operation of the multiple listing service. The Board’s data does not permit precise allocation of the costs attributable to its multiple listing service and to its other activities; however, of total expenses of $76,654.70, $32,591.50 is directly allocable to the listing service, as is a substantial portion of $16,339.11 salaries expense. It would be reasonable to estimate that the listing service produced from $10,000 to $15,000 profit for the year, or from 27% to 40% of the Board’s gross income from all sources other *692 than the multiple listing service.[4] These figures would seem more nearly to indicate that the listing service is now the dominant, rather than an incidental, activity of the Evans-ton-North Shore Board.
Plaintiff asks that we disregard this data, however, and look instead to the overriding “purpose” of the Board to determine the significance of the multiple listing system in its over-all structure. Admittedly, there is considerable evidence in the record that the Board and its predecessor were formed for the purpose of eliminating abusive and unethical practices among local realtors and to promote what was considered to be healthy cooperation between the brokers. It is also true that in determining the relative importance of the activities of an organization so as to pass upon the application of the exemption statute, courts have often worded their analysis in terms of the purpose, or raison d'etre, of the organization. E.g., Associated Industries of Cleveland v. Commissioner, 7 T.C. 1449, 1467, 1468 (1946); National Leather & Shoe Finders Assn. v. Commissioner, 9 T.C. 121, 127 (1947). But these cases do not support the contention that a group’s purpose can be disassociated from its activities. To the contrary, in Scripture Press Foundation v. United States, 152 Ct. Cl. 463, 285 F. 2d 800 (1961), cert. denied, 368 U.S. 985 (1962), a religious publishing house claimed exemption under a related statute applying to organizations devoted to religious purposes;[5] the organization contended that its fundamental objective was to stimulate the growth of Sunday schools in the United States, primarily by rendering free instructional services through its Instructional Department, rather than to earn profits. In rejecting the significance of this fact, Chief Judge Jones asserted the following for this court:
*693 “We think that plaintiff’s assertion that its instructional activities are more important to plaintiff than its selling activities is entirely sincere. The evidence in this case, as is amply borne out by the findings of the trial commissioner, shows that throughout its history Scripture Press has been led by people of devout and intense religious conviction. However, the intensity of the religious convictions of the plaintiff’s members and officers cannot operate to exempt them from the tax law if the activities of the plaintiff cannot in themselves justify such an exemption. Piety is no defense to the assessments of the tax collector.
* $ $ $ *
We think it is fair in making a determination as to what was the most important aspect of plaintiff’s work to compare how much plaintiff accumulated as a result of its sales of religious literature and how much it expended for instructional activities.” 152 Ct. Cl. at 470, 285 F. 2d at 804.
The court went on to hold that “the enormity of the contrast between what plaintiff has accumulated from sales each year and what it has expended for its educational programs reveals that the sale of religious literature is its primary activity and that its instructional phase is incidental thereto.” In accord, see American Institute for Economic Research v. United States, 157 Ct. Cl. 548, 302 F. 2d 934, cert. denied, 372 U.S. 976 (1962); Consumer-Farmer Milk Cooperative v. Commissioner, 186 F. 2d 68 (C.A. 2, 1950), cert. denied, 341 U.S. 931 (1951); Durham Merchant's Assn. v. United States, 34 F. Supp. 71 (M.D. N.C., 1940); Fort Worth Grain & Cotton Exchange v. Commissioner, 27 B.T.A. 983 (1933).
In seeking to minimize the importance of such financial data, plaintiff points out that in Milwaukee Assn. of Commerce v. United States, 72 F. Supp. 310 (E.D. Wis., 1947), an association which earned profits of $20,000 over a three year period from nonexempt activities was held exempt under the predecessor to § 501(c) (6). Plaintiff fails to point out, however, that the association also had other revenues of $337,734.19 for this same period. With better justification, plaintiff places reliance on Commissioner v. Chicago Graphic Arts Fed., 128 F. 2d 424 (C.A. 7, 1942), where for the tax years 1936 and 1937, the federation had received 40% and *694 34% of its revenues from nonexempt activities, but was nonetheless held entitled to exemption. However, in that case the relative importance of the nonexempt activities had steadily declined to 17 % in 1939; more important, the court, though holding the nonexempt activities “incidental or subordinate to * * * [the federation’s] main or principal purpose,” quoted from Northwestern Municipal Assn. v. United States, 99 F. 2d 460, 463 (C.A. 8, 1938), to the effect that in applying the exemption statute, “the court often considers which of its activities represents the maim, purpose of its operations and which are incidental thereto.” 128 F. 2d at 427. (Emphasis added.)
We do not say that financial data of the type here present is the only relevant criterion of the importance of one of an organization’s many activities. But we do hold that the relative contribution to plaintiff’s receipts and expenditures of its listing service, and the amount of personnel which the service requires, are sufficiently substantial that the listing service cannot be regarded as an incidental activity of the Board.
It follows from what we have said that the plaintiff is entitled to no refund; its complaint is therefore dismissed.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner William E. Day, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiff, Evanston-North Shore Board of Eealtors, is a not-for-profit corporation organized under the laws of the State of Illinois on January 27, 1936, as the successor of the Evanston Eeal Estate Board, an Illinois corporation organized on January 15, 1919, under the not-for-profit provisions of the Illinois Corporation Act of 1872.
2. According to its Articles of Incorporation, the plaintiff was formed in 1936, for the same purposes as its immediate predecessor, the Evanston Eeal Estate Board. Those purposes were:
(a) To establish and standardize the business of real *695 estate brokerage, so that it shall obtain and hold the confidence and respect of both owners and purchasers;
(b) To maintain the dignity and responsibility of its members in their duty to the public;
(c) To cultivate and enforce fair dealing and foster good fellowship among its members in their business of buying, selling, renting, and managing real estate, and loaning money thereon;
(d) To provide an organized center of effort for adequate and economic civic development;
(e) To procure just and even taxation;
(f) To promote such a system of law and administration as shall protect our citizens, encourage industry, and attract the desirable population to which our condition entitles us, to especially guard and advance the interests of real estate ownership and leaseholds; and
(g) To devise, advocate, and support legislation calculated to improve our cities.
3. Plaintiff’s membership is limited to real estate brokers and salesmen licensed as such by the State of Illinois and to certain other persons such as contractors, appraisers, mortgage 'bankers and others with a special interest in the business of real estate brokerage who are admitted as special members of the Board with a limited right to participate in its activities.
4. Real estate brokers and salesmen who have been licensed by the State of Illinois and who operate within the area of the jurisdiction of plaintiff are admitted to membership in the Board either as active or as active associate members. To be an active member of the Board, an individual must maintain an office within plaintiff’s territorial jurisdiction, separate from his home and in a nonresidential area or other area where local zoning laws permit the operation of such a business, and must have been actively engaged in the real estate business in the North Shore suburbs of Chicago, Illinois, for a period of not less than 6 months. Only one member of any one firm or corporation is eligible for active membership in the Board. Other members and employees of such a firm who are actively engaged in the real estate business are admitted to the Board as active associate members.
*696 5. As of June 30, 1959, there were 581 active and active associate members in the Board, of whom approximately 100 were active members.
6. During the year in suit, the initiation fee for the plaintiff’s active members was $1,000 and for active associate members, $100. Annual dues for active members were $85 and for active associate members, $20, which sums included the annual dues payable 'by the plaintiff’s members to both the Illinois and National Associations of Real Estate Boards (sometimes hereafter referred to as NAREB).
.7. The term “realtor” is the registered trademark of the National Association of Real Estate Boards. By virtue of their membership in the National Association and their pledge to abide by that Association’s Code of Ethics, the plaintiff’s active members are entitled to describe themselves as realtors.
8. The plaintiff, as a real estate board, is a member of the Illinois Association of Real Estate Boards and the National Association of Real Estate Boards. By virtue of their membership in the plaintiff Board, the plaintiff’s members are also members of the National Association of Real Estate Boards.
9. Through its member selection program the Board has attempted to improve the quality and training of real estate salesmen and brokers who become members of the Board. This program, which gradually developed over the years, was initiated in about 1938. It presently consists of screening, educating, testing and observing new applicants before they are admitted to membership. Applicants’ references, and if salesmen, their employers, and if brokers, their financial statements, are checked. If these investigations prove satisfactory, applicants are admitted to a probationary status for a period of 6 months. During this period applicants must attend a 6-week educational program consisting of lectures by Board members concerning various aspects of the conduct of a real estate business. At the conclusion of the educational program, applicants must pass a written examination with a score of 75 percent or better. If during the 6-month probationary period their conduct has been in keep- *697 rag with plaintiff’s standards, and they make a passing grade on the written examination, the applicants are admitted to membership in the Board.
10o The plaintiff, as part of its program of education, to its members, began in 1957 to make provision for payment of tuition at local universities. The record does not show the amount which was actually spent for tuition in any year. The reserve for this purpose for the fiscal year ended June 30th for the years 1958-1961, is as follows:
1958_ $l, 510.00
1959_ 5,151. 89
1960_ ■ 6,839.44
1961_ 10, 385. 81
There is some indication that some of the tuition paid has been forfeited.
11. On December 20,1941, the plaintiff, then known as the Evanston-North Shore Real Estate Board, applied to the Commissioner of Internal Revenue for a ruling to the effect that it was a “real estate board” within the meaning of Section 101(7) of the Internal Revenue Code of 1939. For the period January 1, 1940, to May 31, 1940, the plaintiff’s receipts and expenses totaled $2,794.28 and $815.56, respectively. For the period June 1,1940, to May 31,1941, receipts and expenses totaled $2,833.10 and $2,515.22, respectively. The above information as to source of its revenue and its expenses was furnished to the Commissioner with the plaintiff’s application. By letter of January 13, 1942, the Commissioner of Internal Revenue advised the plaintiff that, based on the information submitted by the plaintiff, it qualified for exemption under Section 101 (7).
12. In April 1951, the plaintiff was requested by the Internal Revenue Service to fill out an application for exemption “* * * designed to develop the facts necessary to determine whether you qualify for exemption from Federal income tax * * The plaintiff, through counsel, on May 17, 1951, forwarded an executed application to the Commissioner of Internal Revenue. The source of all income of plaintiff was therein stated to be derived from “dues from . *698 members.” The purposes for which such funds were stated to be expended were “office expense; salaries of office personnel, postage, printing information bulletins for members.” No information was requested or given concerning the amount of its income or expenses. On June 8, 1951, the plaintiff was advised by the Deputy Commissioner that, upon the evidence presented, it was “exempt from Federal income tax under the provisions of section 101(7) of the Internal Revenue Code, and corresponding provisions of prior revenue acts.”
13. On May 13, 1957, the District Director of Internal Revenue for the District of Illinois, wrote to the plaintiff requesting that it submit an executed application for exemption (Form 1024), completely filled out, together with the following:
1. Classified statement of receipts and expenditures for fiscal year ended June 30,1956.
2. Statement of assets and liabilities as of June 30,1956.
3. Copy of Articles of Incorporation if incorporated.
4. Copy of Constitution and By-Laws complete with Amendments.
14. On or about June 19, 1957, the plaintiff submitted its exemption application on Form 1024, which is in evidence as plaintiff’s exhibit 21A through 21AA and which is hereby incorporated by reference as a part of this finding. In the application, the plaintiff briefly stated the purpose for which the organization was formed to be “operates a real estate board.” The activities in which the organization had been engaged during its last 2 years of operation were stated to be as follows:
Valuation of real estate
Arbitration
Publish monthly bulletin
Listing services
Furnish information to members
Conduct educational courses for applicants and members
Attached to the application were a balance sheet showing assets of some $66,000, and statements of income and expenses, as follows:
*699 STATEMENT OF INCOME
Tear Ended June 30,1956
Income:
Initiation fees_ $1, 500. 00
Transfer fees_ 450. 00
Dues — ■
Active members_$5, 850. 00
Active Class B members_ 980. 00
Active associate members- 7,980. 00
Associate members_ 350. 00
- 15,160.00
Income from applicants_ 1, 462. 50
Members’ meetings, dinners, etc_ 10, 982. 25
Multi-list service_ 57, 381. 60
Bulletin- 3, 900. 00
Supplies- 1, 968.45
Appraisals_ 800. 00
Arbitration_ 139. 88
Mailing service_ 62.62
Interest_ 807.37
Sundry_ 38.10
$94, 652. 77
STATEMENT OF EXPENSES
Year Ended June 30, 1956
Appraisals_ $544.76
Advertising and public relations_ 758. 35
Audit and accounting services_ 994. 00
Amortization of leasehold improvements_ 291. 87
Bad debts_ 31.25
Bulletin_ 1, 904. 25
Catalogue_ 1,184. 39
Convention and travel_ 1, 682. 73
Depreciation_ 684. 64
Directors’ meetings_ 37. 00
Dues and subscriptions- 89. 00
Heat_ 307.55
Insurance_ 188. 51
Legal services_ 150. 00
Light, gas, and water- 246.23
Members’ meetings, dinners, etc- 10, 714. 85
Multi-list reproduction costs- 25, 617. 63
Multi-list postage and supplies- 6, 973. 87
Office salaries- 16,339.11
Office maintenance_ 855.17
*700 STATEMENT OF EXPENSES — Continued
Year Ended June 30,1965
Postage_ $441. 72
Printing_ 240.68
Bent_ 1,200. 00
Bepairs — equipment- 291.41
Stationery and office supplies- 819.43
Supplies_ 1, 374. 84
Taxes — federal insurance contributions- 283.17
Taxes — unemployment insurance- 243.13
Telephone_ 1, 358.33
Loss on retirements- 54. 24
Sundry_ 752.59
Total Expenses_$76, 654. 70
15. By a letter of December 5, 1957, Mr. R. C. Dunlap, Exempt Organizations Branch, Internal Revenue Service, advised the plaintiff that on the basis of the information then before it, the Service was considering the revocation of its income 'tax exemption in view of the fact that, according to its 'financial statements, one of the plaintiff’s principal activities was the operation of a multiple listing service. Mr. Dunlap advised, however, that before the Service would take final action, it would afford the plaintiff a conference and the opportunity to submit such additional information as it desired. By letters dated December 13, 1957, and April 28, 1959, the plaintiff requested conferences and advised the Service that it would be represented in this matter by Mr. George P. Ellis, consultant and comptroller of the National Association of Real Estate Boards. Such conferences were held.
16. By a letter of June 10, 1960, the Commissioner of Internal Revenue advised the plaintiff that its exempt status was terminated effective on June 30, 1958, the end of plaintiff’s 1958 fiscal year. The ground on which the Commissioner revoked his prior ruling was stated in a ruling letter issued by the Commissioner on June 10,1960, which reads in part as follows:
By letter dated December 5, 1957, you were advised that we proposed to revoke our above exemption rulings because of a conclusion that your primary activity is the operation of a multiple listing system, which activity re- *701 suits in tbe performance of particular services for individual persons and is a business of a kind ordinarily carried on for profit. As you have since been apprised, such conclusion reflects the Service position set forth in Revenue Ruling 59-234, Internal Revenue Bulletin 1959-28.11, which reads, in part, as follows:
“* * * It is apparent that the multiple listing system as operated by real estate boards is inherently designed for the rendering of particular services for individual members 'as a convenience and economy in the conduct of their respective businesses. Therefore, the instant organization, instead of primarily engaging in activities for the improvement of business conditions within the ■real estate Ibusiness generally, is performing particular services for its members through the maintenance and operation of its multiple listing system by providing them with listings of properties for sale, which serve them as a convenience and economy in the conduct of their businesses. It is further concluded that the operation of a real estate multiple listing service constitutes a business of a kind ordinarily carried on for profit.
“Accordingly, it is held, where the primary purpose or activity of a real-estate board is the operation of a multiple listing system, the real-estate board is not entitled to exemption from Federal income tax as an organization described in section 501(c) (6) of the Code.”
The ruling letter also contained a detailed statement setting forth the reasons why the Commissioner had determined that a multiple listing service resulted in the performance of particular services for individual persons. This statement was, in part, as follows:
With reference to the question of whether the multiple listing system results in the performance of particular services for individual persons, the National Association of Real Estate Boards, as quoted above, has described the system as “a medium through which real estate may be merchandised efficiently” and as a “tremendous merchandising method.” Further, listings are considered a “stock in trade.” It is also pertinent to note that although you contend that the real estate business and the community as a whole benefit therefrom, the systems are supported by payments of a portion of the income which specific realtors derive from the existence of the system. We hold, therefore, that the principal purpose of the system is to furnish salable property, to those realtors who participate in the program, which *702 purpose is clearly aimed at the benefit of the participants in their individual capacities rather than the quasi-public, semi-civic benefit of the business community as a whole in the manner contemplated by the applicable Income Tax Regulations.
In connection with the question whether the operation of a multiple listing system is a business of a kind ordinarily carried on for profit, it is material to note that we have consistently so held in considering the income tax status of organizations which engaged in no other activities. In commenting upon such Service policy, in a brief dated October 30, 1956, filed by Mr. George P. Ellis, C.P.A., Comptroller and Consultant, National Association of Real Estate Boards, the following statement was made:
°‘The so-called Multiple Listing Services operated outside and independent of a real estate board, are in fact, nothing more than a cooperative sales department of a purely business operation. They do not have an exempt objective. * * * ”
The only material difference in the operation of the multiple listing services to which Mr. Ellis referred and those to which Revenue Ruling 59-234 refers lies in the fact that in one instance they are separately operated, while in the other the service is conducted by a real-estate board. We do not consider such difference sufficient to justify a distinction between the two types of multiple listing systems.
17. After the ruling on June 10, 1960, that plaintiff did not qualify for exemption under Section 501(c) (6) of the Internal Revenue Code of 1954, the District Director of Internal Revenue at Chicago, Illinois, acting on behalf of defendant, proposed a deficiency in Federal income taxes against plaintiff for the fiscal year ended June 30,1959, in the amount of $3,510.89. On February 28, 1961, plaintiff duly paid Federal income taxes in the amount of $3,510.89, for the amount of the deficiency proposed by the Director for this fiscal year, together with interest in the amount of $324.76.
18. On March 13, 1961, within 2 years of the date of payment of said tax, plaintiff filed with the District Director of Internal Revenue at Chicago, Illinois, in accordance with applicable rules and regulations, a timely claim for refund (Form 843) requesting a refund of taxes and interest paid *703 in the amount of $3,835.65 on the ground that it was exempt under the provision of Section 501(c) (6) of the Internal Revenue Code of 1954, and that the revocation of the June 8, 1951, ruling as to its exempt status was erroneous. On March 23, 1961, the District Director of Internal Revenue at Chicago, Illinois, acting on behalf of defendant, gave plaintiff notice, by a “certified mail” letter, of his disallowance of the aforesaid refund claim.
19. On March 29, 1961, within 2 years of the Commissioner’s formal disallowance of its refund claim, the plaintiff filed this action.
20. The Evanston-North Shore Board of Realtors is, and always has been, the sole and absolute owner of the claim presented in this action and has never made any transfer or assignment of such claim or any part thereof. No action on this claim has been taken before the Congress of the United States or before any of the departments of the Government other than action by the Treasury Department preceding this suit and set forth above. No other suit or process by plaintiff or any assignee is pending in any other court on this claim.
21. The bulk of the plaintiff’s various activities is conducted under the auspices and direction of the several standing committees established under its By-Laws. During the year in suit such committees were: Arbitration, Ethics, Attendance, Brokerage, Budget and Finance, By-Laws, Education, Legislation and Taxation, Membership, Mortgage, Program, Realtor and Advertising, Renting and Management, Sports, Valuation, Women’s Affairs, and Zoning-Planning. In addition, other committees are set up for particular purposes — such committees as Morale and Transportation. The plaintiff also has an Insurance Committee, the purpose of which is to study group health insurance plans for its members and pension plan coverage for its employees.
22. As a condition of their membership, all members of the plaintiff Board agree to submit any commission disputes that arise among themselves to binding arbitration by the Arbitration Committee. The purpose of this By-Law provision is to insure that such controversies do not create adverse public relations for the plaintiff or its members. The *704 Arbitration. Committee is concerned solely witb problems of commission disputes.
23. Tbe Ethics Committee deals only with enforcement of the Code of Ethics promulgated by the National Association of Real Estate Boards, which have as their principal objective the fostering of the practice of fair dealing by real estate brokers and salesmen with their principals and with each other. Matters come before this committee when a complaint is lodged by a member of the public or by a Board member, or on the committee’s own initiative. Thereupon a hearing is held and a decision issued by the committee winch, with the approval of the plaintiff’s Board of Directors, is empowered to fine, suspend, or expel a Board member.
24. Plaintiff’s Zoning and Planning Committee is made up of 1 member from each of the 18 communities within the Board’s jurisdiction. Each member is charged with keeping in contact with the municipal government in his specific community on all matters relating to real estate. The committee maintains a library of zoning ordinances and publicizes all changes in those ordinances. The committee also offers its services to local governments within the area of its jurisdiction and has, upon request, in numerous instances, assisted municipalities in drafting new zoning ordinances or changes in existing ordinances, including a recently adopted new zoning law of the city of Evanston, Illinois. The Board, through its individual members, also aids the enforcement of building and zoning regulations by notifying local building commissioners of zoning violations which come to their attention in the course of buying, selling, and showing properties.
25. Through a project called “Build America Better,” which was sponsored by the National Association of Real Estate Boards, plaintiff has promoted and publicized the need for urban rehabilitation and renewal. To implement this project, its members have shown films and have lectured to clubs and the public on the necessity for urban renewal, and have taken pictures of cleanliness violations and the like and presented them to the building and health authorities of cities and towns within the Board’s jurisdiction with a request that action be taken to remedy them. As part *705 of tbis program, plaintiff and its members were successful in securing incorporation in the new zoning ordinance of the city of Evanston, Illinois, of requirements for tuckpointing, painting, rewiring, and cleanup.
26. Through a Transportation Committee, plaintiff has worked to develop transportation facilities in the area of its jurisdiction and has worked with other civic groups in opposition to abandonment of a local interurban railway. Through a Highway Beautification Committee, plaintiff has worked with various garden clubs for the beautification of roads and highways within the area of its jurisdiction.
27. Other activities of the Board include social events and activities carried on for the purpose of promoting attendance at Board meetings and in stimulating interest on the part of Board members in the affairs of the Board. These activities are carried on through a Sports Committee and an Attendance and Beception Committee.
28. Clearly the most important committee of the plaintiff was its Brokerage Committee. In its 1959 official register, the plaintiff describes the function of its Brokerage Committee as follows:
This committee’s duties are also well defined in the By-laws. The Cooperative Listing Service is under its control, as well as the formulation and amendment of rules and regulations of brokerage practices, the development.of listing forms and any other tools which will help us in our business.
29. The Brokerage Committee is charged with the duty of formulating rules and regulations for the operation of the cooperative listing service, also referred to in the record as multiple listing service. This committee consists of 11 members of whom 5 are active members. It provides the supervision over the mechanical details of the listing service as well as insuring compliance with its rules and regulations by the plaintiff’s members in its operation.
30. The multiple listing service, as operated by the plaintiff, has as its foundation the sharing among its active members (brokers) the listings of other active members. The operation under this service is mandatory on all active and active associate members (salesmen) of the Board except *706 those whose application for exemption is recommended by the Brokerage Committee and is approved by the Board of Directors. Exemption is granted only to those members whose primary business is not the sale of residential property.
31. Article XIII of the 1959 By-Laws of the plaintiff provides, in part, as follows:
ARTICLE Xm
Co-operative Listing Service
Section 1.
The Co-operative Listing Service of the Evanston-North Shore Board of Bealtors is hereby made a part of the By-Laws of said Board and all regulations set up for the operation of said Co-operative Listing Service shall be subject to all of the Articles of the By-Laws of the Evanston-North Shore Board of Bealtors.
Section 2. Bules and Begulations.
A — Purpose
The Co-operative Listing Service operates and functions by authority of the Articles of Incorporation and the Constitution and By-Laws of the Evanston-North Shore Board of Bealtors. ■
1) Every rule of co-operative listing is designated to expedite sale of real estate with due regard for the rights of the listing office, the selling office and the public. This principle underlines every rule, decision or conduct.
2) Any effort or act which withholds from the other members any of the rights or benefits is a violation of the spirit of co-operative listing service.
$ ‡
E — Members Exemptions from the Service
The Co-operative Listing Service shall be mandatory on all Active and Active-Associate members of the Board except those whose application for exemption from the Service is recommended by the Brokerage Committee and is approved by the Board of Directors. Exemptions will be granted only to those members whose primary business is not the sale of residential property.
32. At all times material herein, the multiple listing operation conducted by the plaintiff operated generally in the following manner:
(1) A real estate broker enters into a contract with the owner of a property to act as his agent for the sale *707 of such property under a written contract, the form of which has been approved by the plaintiff.
(2) The broker (hereinafter referred to as the “listing broker”) entering into the contract with the owner forwards certain information regarding the property to be sold to the Board office, using for this purpose a form provided by the plaintiff which records details as to construction, lot size, amount of taxes, location with respect to schools, transportation, availability to city conveniences, and the price at which offered. This form is required by the plaintiff’s By-Laws to be sent within 48 hours of the time the contract is entered into by its member.
(3) The listing broker pays the Board $10 at the time he sends two copies of the detailed information referred to in the preceding paragraph.
(4) The plaintiff assigns an identification number to the property offered for sale and orders a picture of the property from a professional photographer who is hired by the plaintiff.
(5) The original copy of the detailed information of the offer is picked up by a printer hired by the plaintiff, and the photograph of the property described in the detailed information is sent to the printer.
(6) The printer prints a circular containing the detailed information on the property offered for sale, and mails a copy directly to all broker members of the plaintiff excepting those few who have ben exempted from participation in the multiple listing operation. Normal distribution is one copy for each salesman, plus two copies for each office.
(7) The owner of the property and the listing broker select a day for the inspection of the house by other brokers, and the plaintiff’s office is advised of the date selected. A list of properties open for inspection each week with the dates on which they may be inspected is prepared by the plaintiff’s office each week and mailed to all participating broker members every Thursday. An exhibit in evidence, being a particular circular listing houses open for inspection, lists 28 houses open for inspection on June 13, 1961, and 30 open for inspection on June 14,1961.
(8) Changes in the detailed information concerning the property for sale are reported, in writing, to the plaintiff’s office on forms provided for the purpose by plaintiff. Typical of such changes are changes in price or terms at which the property is offered, withdrawal of the property from the market, sale of the property, availability of financing, or expiration of the listing. *708 Twice weekly a report of changes is prepared and mailed by the plaintiff to all broker members’ offices.
(9) When a property which has been listed is sold, ■the listing broker advises the plaintiff, on a form provided by it, at which time it pays the additional fees due. If the listing broker effects the sale (either solely or cooperatively through a nonmember), a fee of $2 is due the plaintiff, or a total of $12 (including the original listing fee). If the sale is effected cooperatively through another member broker, a fee of $14 is due ($2 from the listing broker and $12 from the selling broker) or a total (including the original listing fee) of $24. It is the listing broker’s responsibility to collect and remit to the plaintiff’s office the selling broker’s portion of the fee.
(10) Twice a month a catalog index is prepared and distributed by the plaintiff’s office showing all properties currently offered for sale. This index sometimes may contain 30 pages or more.
(11) Each member brokerage office (active members) makes a payment of $7 per month to the plaintiff to cover the costs of the catalog index.
(12) Once each month a report of market activity is prepared by the plaintiff’s office and mailed to each member’s office.
(13) Once each month a sales report listing information showing closing date, address, last listed price, indicated sales price or revenue stamps, broker listed by, and broker sold by, is mailed to each member’s office.
(14) The plaintiff arranges for the printing and pays the cost of all forms used in the multiple listing operations.
33. Under the plaintiff’s system, all brokers must file a notice with the Board in which they declare their offices as operating under either a 60-40 or a 50-50 commission split. Formerly, when it was more difficult to sell real estate than to obtain an exclusive listing of property, most members operated under an arrangement giving the listing office 40 percent of the sales commission and the selling office 60 percent. In recent years, however, market conditions have changed so that it has been easier to sell property than to secure a listing for its sale. Consequently, most of the plaintiff’s members now operate under a 50-50 commission split. The plaintiff’s rules provide that in a sales transaction involving two brokers, one of whom operates on a 60-40 basis and the other on a 50-50 basis, the latter shall govern.
*709 34. In 1948, the plaintiff had one employee who was its executive secretary. At the time of the trial of this action, December 5, 1961, the plaintiff had five full-time employees and one part-time employee. It is a reasonable inference from the entire record that the increase in the number of employees was due in large measure to its operation of the multiple listing service.
35. The executive secretaries of real estate boards throughout the country, under the auspices of NAKED, have an organization called the Secretaries Council. Much of the activities of this Council are and have been directed to the exchange of information concerning the operation of multiple listing services. This Council publishes quarterly a publication entitled “Multiple Listing Digestaire.”
36. In the February 1954 issue of the above-described publication, the following article, headed “Multiple Listing— the Evanston Plan,” appeared by the then chairman of the Brokerage Committee of the plaintiff real estate Board:
It was just a year ago that the Evanston-North Shore Board of Kealtors launched its central multiple listing system with a photographic reproduction of the property.
Cooperation in the sale of properties in this area has ■been practiced many years by our board members. It has been the responsibility of each office to notify all other board members within fourteen days of the exclusive listings they had contracted. The re-typing of this listing information in each office was becoming a heavy burden; members’ office staffs were bogged down, unable to keep ahead of the task. It seems quite reasonable that the listing information could be duplicated quicker, more complete, and certainly at a saving of time and expense if done at a central location and then distributed. These were the factors which brought our multiple listing system into focus.
Yes, we went through the usual processes every other board experiences in developing the mechanics best suited to our needs. And even after a plan was developed, and used, it became obvious that some readjustments were necessary — improvements could be made. It was then that we designed an original plan which is now known as the Evanston Plan.
For the first five months, the listings were serviced on a flat basis of a $20.00 listing fee per listing, paid in *710 advance. This fee proved to be too heavy a charge and caused serious repercussions among the membership, with loud cries from the larger offices, who were contributing the bulk of the listings and felt that at least half the costs should be paid by recipients who were being supplied with a portfolio of listings free of charge and contributing little in return. On the other hand, most of the smaller offices were dead set against paying any considerable set fee for listings 'that they might not be able to use, although they were willing to pay for benefits as, if, and when received.
The tug-of-war between these factions was reaching a point where it threatened the continued existence of the Board as a working unit. A fortunate solution was evolved by basing the charges primarily on a “pay-after-the-deal-is-made” sales fee basis, combined with a returnable listing fee large enough to keep out the “dogs,” plus a very nominal monthly service charge of only $5.00 per office for those offices actually engaged in the residential brokerage business.
The $10.00 Listing Fee, returnable when the deal is made, provides an operating reserve even when sales are few. The $12.00 per deal Sales Fee paid to the board office after each deal ($24.00 shared by each broker on cross deals) comes when the commission is paid and at a time when it is the least painful to pay. And the nominal monthly Service Charge of only $5.00 per office is reasonable enough not to hurt any office actively engaged in the brokerage business, no matter how small it is.
Our listing sheets are reproduced by a combined process of xerography and multilith. Listing information is reproduced direct from the typed forms furnished by the listing broker; these are not retyped in the board office. The offset printing work is farmed out, and the printer also does the mailing. (Note : See “Simplifying the Mechanics of Multiple Listing” in the Fall, 1952, MULTIPLE LISTING DIGESTAIRE.)
About four months ago a study was made on whether or not a reduction in the cost could be realized if the board purchased and operated its own multilith machinery. After several committee meetings and conferences with the printer, it was the unanimous conclusion of the Brokerage Committee that any possible savings would be more than counterbalanced by the uncertainty of experienced help, by the additional office space required for equipment and stock supplies, and by the general confusion and noise created by the operation of the machinery in the board office.
*711 Listings are mailed to all members three times a week: Monday, Wednesday, and Friday. A report of the listing changes and sales is mailed twice a week: Tuesday and Friday. This latter report is mimeographed and mailed from the board office.
Recent studies of the past months’ operations reveal that 55% of all sales are made by the broker selling his own listing, while 45% of the sales involve listing by one broker and selling by another. The lag between the listing time and the payment of the sales fee has turned out to be longer than was anticipated. For instance, the November listings: After four months, only 43% were reported as sold, 38% were still on the active market, and 19% had been withdrawn, rented or expired. At the end of six months, 49% were reported sold; 25% were still on the active market and 25% had been withdrawn, rented or expired.
A multiple listing system is built on mutual trust. Violations of the spirit of cooperation are felt by all members, but most of all by the ones who take undue advantage and break the trust. Evanston and North Shore Realtors take real pride in their spirit of cooperation as demonstrated during this first years’ operation. We believe the multiple listing service has cemented members of the board together on a more sound basis than ever before.
37. In 1956, the plaintiff’s By-Laws regarding procedure on dissolution provided as follows:
article vrn
Procedure in Dissolution
Section 1. Method.
In case of dissolution of the Board for any reason whatsoever, a Committee of five (5) shall be elected to liquidate all the tangible assets of said Board and divide the proceeds derived therefrom equally among the then Active and Active-Assocate members of said Board.
As amended up to September 13, 1960, Article VIII of the By-Laws provided as follows :
ARTICLE VIII
Procedure in Dissolution
Section 1. Method.
In the event this Board shall at any time terminate its activities, the Board of Directors shall consider and *712 adopt a plan of liquidation and dissolution, which said plan shall provide for the collection of all assets of the Board, the sale or other proper disposition of any real and personal property owned by the Board, the payment of all liabilities and the distribution of any surplus remaining to such non-profit charitable organization or organizations as shall be selected by the Board of Directors.
38. The financial figures quoted in finding 14, which were before the Commissioner of Internal Revenue at the time his June 1960 ruling was made, furnish the best basis in the record for a recent year as to the source of plaintiff’s revenue and its disposition.
39. Plaintiff has no shareholders or stockholders.
40. Plaintiff has never declared a dividend or made a distribution of any kind to its members.
CONCLUSION OE LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is not entitled to recover, and the petition is, therefore, dismissed.

 Treas. Reg. 1.501(e) (6)-l:
Business leagues} chambers of commerce, real estate boards, and boards of trade. A business league is an association of persons having some common business interest, the purpose of which is to promote such common business interest and not to engage in a regular business of a kind ordinarily carried on for profit. It is an organization of the same general class as a chamber of *686 commerce or board of trade. Thus, its activities should be directed to the improvement of business conditions of one or more lines of business as distinguished from the performance of particular services for individual persons. An organization whose purpose is to engage in a regular business of a kind ordinarily carried on for profit, even though the business is conducted on a cooperative basis or produces only sufficient income to be self-sustaining, is not a business league. An association engaged in furnishing information to prospective investors, to enable them to make sound investments, is not a business league, since its activities do not further any common business interest, even though all of its income is devoted to the purpose stated. A stock or commodity exchange is not a business league, a chamber of commerce, or a board of trade within the meaning of section 501(c)(6) and is not exempt from tax. . . .”
There is no suggestion that these standards are not equally applicable to a real estate board. Indeed, the legislative history to the 1928 act, in which “real-estate boards” was added to the statute, suggests that the same standards were intended to apply to real estate boards as to the other organizations covered by the exemption provision. See Hearings before House Committee on Ways and Means on Revenue Revision 1927-28, Interim, 69th-70th Congresses, 235-238.

 “This is why Exchanges exist, not only Stock Exchanges, but market-places of all kinds: Buyers seek the largest market they can get in order to obtain the lowest prices; sellers, in order to obtain the highest prices; and so it was learned long ago that economy of time and labor, as well as a theoretically perfect market, could be best secured by an organization under one roof of as many dealers in a commodity as could be found. Bear in mind that this result, moreover, is best accomplished when the organization is so controlled by rigid rules of business morality as to insure to every one who does business there, great and small, rich and poor, an absolutely square deal. In such a market every purchase is made with the most thorough acquaintance with the conditions involved. Each dealer, each broker, each speculator, strives to obtain the best knowledge of the supply and demand, and the earliest news that may affect it, and each buyer or seller has an equal and a fair opportunity to profit by the resultant effect on the market of all these various agencies. The larger the body of brokers and traders, then, the more accurate the standards of value thus created. It is a pity you could not have bought your piano under such conditions.” Van Antwerp, The Stock Exchange from Within 0-7 (1913).

 See Findings 14, 38.

 See Finding 14. The Board’s gross income from all sources other than the listing service was $37,271.17. If the profit from the listing service was $10,000, then the percentage was 27%; if $15,000.00, then 40%.

 Internal Revenue Code of 1939 § 101(6), 26 U.S.C. § 101(6) (1952 ed.) ; now Internal Revenue Code of 1954 § 501(c) (3), 26 U.S.C. § 501(c) (3) (1958 ed.). It is true that this provision probably imposes a more rigorous standard than § 501(c) (6), since it requires that the organization be operated “exclusively for religious . . . purposeshowever, in holding that the activities of the organization rather than the convictions of its members must control, the court was referring only to the type of evidence that was relevant, and as to this the decision is apposite here.