**SMITH & WIGGINS GIN, INC.,**
Petitioner,

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

No. 19981.

United States Court of Appeals
Fifth Circuit.

Feb. 9, 1965.

Rehearing Denied March 12, 1965.

⌖513

8. See cases cited in notes 4 and 5, supra, and cases cited by the trial court, 227 F.Supp. at 494–495.

Ben Ferrell Mitchell, Cleveland, Miss., for petitioner.

Karl Schmeidler, Dept. of Justice, Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, Dept. of Justice, Crane C. Hauser, Chief Counsel, Dept. of Justice, I. R. S., Robert B. Alexander, I. R. S., Meyer Rothwacks, Melva M. Graney, Louis F. Claiborne, Dept. of Justice, Washington, D. C., Edward Heilbronner, Department of Justice, Washington, D. C., for respondent.

Before RIVES and WISDOM, Circuit Judges, and MORGAN, District Judge.

MORGAN, District Judge.

This appeal involves deficiencies in federal income tax for the years ending July 31, 1955 and July 31, 1956 in the respective amount of $1,648.28 and $2,573.16. The decision of the Tax Court we are called upon to review under Section 7482 of the Internal Revenue Code of 1954 was entered on February 1, 1962 and is reported at 37 T.C. 861, where the detailed facts may be found.

The two questions presented are (1) whether an amount received by a predecessor partnership as insurance proceeds for loss by fire, of a cotton gin was expended by it in partial replacement of the gin with the result that the depreciation basis of the new gin, to the extent replaced with the insurance proceeds, is the same as that of the destroyed gin, under Section 113(a) (9) of the Internal Revenue Code of 1939, and whether such gin and other property of the partnership was transferred by the partners to the petitioner in a transaction governed by Section 112(b) (5) resulting in the same basis in petitioner's hands as in the hands of the transferor, under Section 113(a) (8); and (2) whether the commissioner properly disallowed as a deduction for the year of 1956 a portion of the amount claimed by the taxpayer as rebate to the patrons.

This Court deems it necessary in passing upon the ruling of the Tax Court to consider the details surrounding the operations of the taxpayer in the years preceding July 31, 1956.

The taxpayer is a corporation organized under the general corporation laws of the State of Mississippi with its principal place of business at Merigold, Mississippi. It is engaged in the business of ginning cotton, bailing cotton for market, and buying and selling cotton seed ginned from seed cotton.

In 1945, a farming corporation known as Smith & Wiggins Gin, Inc., was liquidated and its assets were distributed to its shareholders consisting of members of four family groups, the Smith, Halls, Hills, and Hallmans. One of the assets distributed was a cotton ginning plant. Thereafter, in 1945, the four family group sold a 25% interest in the cotton gin to E. B. Rayner and his wife and formed a partnership known as Smith & Wiggins Gin to gin cotton raised by the partners individually and others. The interests in the partnership were as follows: Rayner, Smith and Hall families,

25% each; Hill family, 21%, and Hall-man family, 4%.

The gin was located in the Mississippi Delta area and the cotton season generally commences there in the latter part of August. In 1948 the cotton crop in Mississippi in the Mississippi Delta area was unusually large. The partnership decided that its present gin was inadequate to handle the large crop. E. D. Rayner, one of the partners was gin manager and he advised the other partners that it would be necessary to remodel the gin in order to gin the 1948 crop. Mr. Rayner and two representatives from two manufacturers of gin machinery and equipment advised the partners as to what was needed. The partners decided to erect a new one-story steel building with reinforced concrete floor and install a double battery, 8-stand gin, and install new processes using part of the old gin. On November 29, 1948 the partnership representative wrote a letter to the New Orleans Bank for Cooperatives to explore the possibility of securing a loan for remodeling the gin.

On February 8, 1949, and on March 9, 1949, the partnership entered into two contracts to purchase machinery and equipment at a total cost of $63,294.62, to be discounted upon prompt payment. The contract prices were to be adjusted to prices prevailing at the time of shipment. By March 15, 1949, the partnership had also entered into other orders.

In the latter part of March, 1949, a fire substantially destroyed the principal gin property, consisting of the machinery and building in which it was housed. As of the date of the fire the fair market value of all the partnership property was $81,635.15, having an adjusted basis as of January 1, 1949, of $21,506.56. At some time not shown by the record, the partnership received $47,208.57 of insurance proceeds for loss of property destroyed by the fire, and deposited the proceeds in the partnership's bank account. The adjusted basis of the destroyed property was $12,437.24 as of January 1, 1949. The fair market value of the property not destroyed by the fire

was $34,426.58, having an adjusted basis of $9,069.32.

The rebuilding of the cotton gin was commenced as soon as possible after the fire in order to have the gin in operation for the 1949 ginning season. With some modifications the original contracts with the suppliers of gin machinery and equipment were carried out. The partners decided to utilize some of the old equipment.

On May 7, 1949, the partnership's representative again wrote the New Orleans Bank for Cooperatives to obtain a loan. This letter contained the initial information required by the bank in order to begin negotiations for a loan and stated in part as follows:

"There is submitted below tentative information with respect to the properties of Smith and Wiggins Gin of Merigold, Mississippi, at present a partnership but contemplating reorganization into a cooperative association under agricultural laws of Mississippi."

The letter also listed in detail the $147,712.47 estimated cost of the new gin building and machinery, the $190,178.58 estimate of the value of the completed gin plant, and the $155,098.09 of cash requirements to complete the construction, including the $100,000 needed from the bank. A statement attached to the letter listed the machinery, equipment, building materials which, by March, 1949, had been ordered or purchased from various companies.

The New Orleans Bank for Cooperatives was organized under the Farm Credit Act. Under its charter its loans were limited to cooperative organizations operating for the mutual benefit of agricultural producers. It was permitted to make loans to corporations organized under general corporation law provided they included in their charters or by-laws the required agricultural cooperative features. The partners had decided to incorporate their ginning business in order to limit their liabilities. They submitted to the New Orleans Bank for Cooperatives an unexecuted proposed pre-

organization contract dated July 6, 1949, including a draft of a proposed charter. The bank suggested several changes in the proposed contract. During July and August 1949, there was correspondence between the partnership's representative and the bank concerning the form of the charter and the by-laws. One of the requirements for a loan was that there be at least 10 shareholders who would be patrons of the gin. Accordingly, in order to meet this requirement, on August 23, 1949, some of the partners executed a "Special Warranty Deed" by which they transferred to members of their families portions of their undivided interest in certain described real property held by the partnership and also in

" * * * any and all other real and personal property of that copartnership known as Smith and Wiggins Gin, including cash on hand and undistributed profits from the ginning season for 1948–1949."

Also, on August 23, 1949, the members of the partnership executed a pre-organization contract in which they agreed to organize a corporation. This contract also included the proposed provisions of the charter and by-laws of the corporation. The contract, which met with the approval of the New Orleans Bank for Cooperatives, provided in part that the partners would convey the property of Smith and Wiggins Gin, "heretofore operated as a partnership" to the corporation, that such property would consist of the undestroyed property, insurance proceeds collected and profits for the year 1948–1949, in the total amount of approximately $115,000, and that the corporation would build a new gin.

On August 24, 1949, the State of Mississippi granted a corporate charter to the taxpayer, Smith and Wiggins Gin, Inc., pursuant to application filed on that date. On August 26, 1949, the incorporators had an organization meeting at which directors were elected. The first

meeting of the board of directors also was held on August 26, 1949, at which time the by-laws were adopted.

The New Orleans Bank for Cooperatives approved the loan application and on August 31, 1949, made a commitment to loan the taxpayer $153,000. The loan commitment was subject to the condition that prior to requesting advances the taxpayer would furnish the bank an audit and a certificate listing the members who had signed membership and patronage agreements, showing the capital investment of each member.

The taxpayer's balance sheet as of August 31, 1949, the beginning of its first taxable year, listed the following assets and liabilities:

August 31, 1949

ASSETS

| | |
|---|---|
| Cash (on hand and in bank) | $ 19,637.86 |
| Machinery and Equipment (new) | 169,859.72 |
| Other Assets | 22,001.40 |
| Total Assets | 211,498.98 |

LIABILITIES

| | |
|---|---|
| Equity in Cooperative Reserve Fund | 14,984.73 |
| Accounts Payable | 19,236.85 |
| Notes Payable | 20,000.00 |
| Capital Stock | — |
| Members Accounts (aggregate) [1] | 157,277.40 |
| Total Liabilities | 211,498.98 |

By deed and bill of sale dated September 1, 1949, the members of the partnership transferred to the taxpayer all the property of the partnership. The deed and bill of sale stated in part that the partners are owners of the property. In return shares of stock, dated September 1, 1949, were issued to the shareholders in substantially the same proportion in

---

1. The Members Accounts (aggregate) consisted of $47,208.57 of insurance proceeds, $43,000 of new money and $67,-068.83 of advances by stockholders (including a $3,705.74 advance by a non-stockholder-member).

which they owned partnership property prior to the exchange.

In accordance with the conditions set forth in the loan agreement a "Schedule of Members Pro-Rata Ownership September 17, 1949" was submitted to the New Orleans Bank. This statement showed the individual percentages of ownership of the corporation and represented that such ownership was attributable to insurance money in the amount of $47,208.57, to new money in the amount of $43,000, and to existing property values in the amount of $35,080.49, for a total equity of $125,289.06. In addition, the statement listed advances made by the stockholders in the amount of $67,068.83 (which also includes an advance by a nonstockholder member in the amount of $3,705.74). The $67,068.83 was stated to consist of "Net Profits from 1948–49 operations of $60,068.83 plus $7,000.00 advances from stockholders." It was also stated that the company made a local bank loan of $20,000 to complete the construction, which was not included in the above figure.

Thereafter, at a time not shown by the record, the taxpayer borrowed a total of $105,000 from the New Orleans Bank for Cooperatives, of which it was required to invest $5,000 in stock of such bank.

Construction of the new gin had continued during the summer of 1949 under the supervision of Rayner. A reinforced concrete floor was laid, and during the summer heavy machinery comprising the gin was received. Rayner assured the machinery salesman that he would pay for the machinery and take all discounts. The partners or the partnership borrowed $50,000 from the Cleveland State Bank, and Rayner also put in some of his own money to pay promptly the bills upon delivery of machinery, equipment and materials to insure receiving the cash discounts. By August, 1949, when the ginning season started, one battery of the gin was complete and in operation and substantial portions of the other battery were on the floor and in the process of being installed. It was completed sometime in September, 1949, by the corporation. After the taxpayer was organized and had received loans from the New Orleans Bank for Cooperatives, it repaid amounts previously borrowed from others by the partners or the partnership out of the proceeds from the New Orleans bank.

The taxpayer filed its first federal income tax return for the taxable year ended August 31, 1950. In its schedule of depreciation it listed the basis of all the machinery, equipment, and buildings which had been built at their cost, or $177,579.09, plus other items, at a cost of $11,255.59, for a total cost basis of $188,834.69. In its federal income tax returns for the taxable years ended July 31, 1955, and July 31, 1956, the taxpayer deducted depreciation in the respective amounts of $15,876.10 and $17,250.54. In computing the depreciation upon that portion of the property which had not been destroyed by fire the taxpayer used as the original cost to it an amount equivalent to the fair market value thereof as of the date of the fire, or $34,426.58. In computing the depreciation on the new gin, the taxpayer used as the original cost to it the entire cost of construction, or $188,834.68.

The Tax Court found as a fact that the partnership constructed the new gin; that it invested therein the $47,208.57 of insurance proceeds; that all the partnership property, including the new gin, was transferred by the partners to the taxpayer upon the latter's organization in exchange for stock, and that the amount of stock received by each partner was substantially in proportion to his interest in the property prior to the exchange. Thereupon, the Tax Court held that the transaction was a nontaxable exchange, that the new gin, to the extent acquired by the use of the $47,208.57 of insurance proceeds, retained the same basis in the hands of the transferors as the old gin which was destroyed, namely, $12,437.24, and that such basis carried over to the taxpayer. The Tax Court further held that the basis in the hands of the taxpayer of the undestroyed assets transfer-

red to it was also the same as the basis in the hands of the transferors, which was $9,069.32.

■ This first question relates to the basis to be used by the petitioner in computing allowable depreciation, under Section 167 of the Internal Revenue Code of 1954, on its cotton gin property for the fiscal years ending July 31, 1955 and July 31, 1956. Since the petitioner acquired the property in a transaction to which the Internal Revenue Code of 1939 applied, the basis is to be determined by reference to the provisions of that Code. (See Section 1052 of the Internal Revenue Code of 1954). The pertinent provisions of the 1939 Code as they existed in 1949 are set out below:

"Transfer to corporation controlled by transferor.—No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation, and immediately after the exchange such person or persons are in control of the corporation; but in the case of an exchange by two or more persons this paragraph shall apply only if the amount of the stock and securities received by each is substantially in proportion to his interest in the property prior to the exchange. Where the transferee assumes a liability of a transferor, or where the property of a transferor is transferred subject to a liability, then for the purpose only of determining whether the amount of stock or securities received by each of the transferors is in the proportion required by this paragraph, the amount of such liability (if under subsection (k) it is not to be considered as "other property or money") shall be considered as stock or securities received by such transferor." [Section 112(b) (5).]

Section 113(a) (8) of such Code provided:

"Property acquired by issuance of stock or as paid-in surplus.—If the property was acquired after December 31, 1920, by a corporation—

"(A) by the issuance of its stock or securities in connection with a transaction described in section 112 (b) (5) (including, also, cases where part of the consideration for the transfer of such property to the corporation was property or money, in addition to such stock or securities), or

"(B) as paid-in surplus or as a contribution to capital, then the basis shall be the same as it would be in the hands of the transferor, increased in the amount of gain or decreased in the amount of loss recognized to the transferor upon such transfer under the law applicable to the year in which the transfer was made."

Section 112(f) of such Code provided:

"Involuntary conversions.—If property (as a result of its destruction in whole or in part, theft or seizure, or an exercise of the power of requisition or condemnation, or the threat or imminence thereof) is compulsorily or involuntarily converted into property similar or related in service or use to the property so converted, or into money which is forthwith in good faith, under regulations prescribed by the Commissioner with the approval of the Secretary, expended in the acquisition of other property similar or related in service or use to the property so converted, or in the acquisition of control of a corporation owning such other property, or in the establishment of a replacement fund, no gain shall be recognized, but loss shall be recognized. * * *"

Section 113(a) (9) of such Code provided:

"Involuntary conversion. If the property was acquired, after February 28, 1913, as the result of a compulsory or involuntary conversion described in section 112(f), (1) or (2), the basis shall be the same as

in the case of the property so converted, decreased in the amount of any money received by the taxpayer which was not expended in accordance with the provisions of law (applicable to the year in which such conversion was made) determining the taxable status of the gain or loss upon such conversion, and increased in the amount of gain or decreased in the amount of loss to the taxpayer recognized upon such conversion under the law applicable to the year in which such conversion was made."

Section 112(f) of the Internal Revenue Code of 1939 provides that no gain shall be recognized upon the involuntary conversion of property into money where the money is expended to acquire property similar or related in service or use or to acquire control of a corporation owning such property. The corresponding basis provision, Section 113(a) (9), provides that the basis of the newly acquired property or stock shall be the same as that of the converted property. Section 112(b) (5) provides for the non-recognition of gain upon the transfer of property to a controlled corporation solely in exchange for the latter's stock or securities, and under Section 113(a) (8) the property retains the same basis in the hands of the controlled corporation which it had in the hands of the transferor.

█ In the present case a cotton gin owned by the Smith and Wiggins Gin, in a partnership, was partially destroyed by fire in 1949. The insurance proceeds were expended in constructing a new cotton gin and the partners transferred money and property to the taxpayer corporation in exchange for all its stock. The sole disagreement between the parties is as to whether the new gin took the lower basis occasioned by the non-recognized gain represented in the insurance proceeds. This poses a factual question as to who built the new gin. In the light of the entire record, there was ample evidence to sustain the conclusion of the Tax Court that the partnership constructed the new gin, it invested therein the insurance proceeds, and all the partnership property, including the new gin, was transferred by the partners to the petitioner upon its organization in exchange for stock, and that the amount of the stock received by each party was substantially in proportion to his interest in the property prior to the exchange. It follows, therefore, that the transaction falls within the provisions of Sections 112(f) and 112(b) (5); and that under Section 113(a) (9) the new gin, to the extent acquired by the use of the insurance proceeds in the amount of $47,208.57 retained the same basis in the hands of the transferors as the old gin which was destroyed; that under Section 113(a) (8) such basis carried over to the petitioner; and that under such section the basis in the hands of the petitioner of the undestroyed assets transferred to it was also the same as the basis in the hands of the transferors.

The second issue involves the tax treatment to be given to patron dividends.

The charter of the taxpayer provides that its stock may be owned only by persons or organizations who produce seed cotton directly or as landlords or tenants. The charter grants to the taxpayer broad powers to engage in business, including all those powers conferred by Mississippi Code 1942, Annotated, Title 21, Chapter 4. The charter provides that the rights and powers shall be exercised primarily for the benefit of the stockholders as producers of seed cotton. It also provides that no by-laws may be altered or repealed with reference to patronage rebates and discounts due to stockholders and nonstockholder members except by a vote of 80 percent of the issued and fully paid outstanding stock.

The taxpayer's by-laws provide that any person or organization producing seed cotton may become a nonstockholding member by entering into a membership and patronage agreement with the taxpayer; that business transacted with nonstockholder members shall not be greater in value than that transacted with stockholder members; and that nonstockholder members shall be treated the

same as stockholder members with respect to rebates and discounts upon patronage contributed by the nonstockholding members. The by-laws also provide that any person or organization which produces argricultural products handled through the taxpayer, but which does not enter into a membership and patronage agreement, shall be known as a nonstockholding nonmember; that nonstockholding nonmembers shall not be entitled as a matter of right to any rebates and discounts upon their patronage, but the board of directors may pay such rebate per bale as they consider necessary to meet competition; and that nonstockholder members and nonstockholder nonmembers shall not have any voice in the management of the affairs of the taxpayer and shall not hold any equity in its capital surplus or reserve.

Both the stockholders and the nonstockholder members are required by the by-laws to sign membership and patronage agreements, agreeing to deliver to the taxpayer for ginning all cotton produced by or for them in the area served by the gin and to sell or deliver to the gin for marketing or processing all the seed from such cotton, under penalty of payment of $10 for each bale of cotton not delivered.

The by-laws further provide that stockholder and nonstockholder members shall be entitled to a patronage rebate calculated upon the taxpayer's income, the latter of which is designated in the by-laws as the taxpayer's excess revenues. The taxpayer shall charge the current price for ginning and, at the time the cotton is ginned, the price currently offered for cottonseed to all persons ginning at the gin. The taxpayer's excess revenues from ginning and wrapping cotton and from all other sources, except from the sale of cottonseed, shall be calculated by deducting from the gross revenue therefrom various expenses, including the cost of operating the gin, depreciation and interest on indebtedness. The excess revenue from trading in cottonseed shall be determined by deducting from the proceeds of sale of cottonseed the cost of the seed purchased plus expenses directly attributable to the handling of the cottonseed.

The by-laws state that the corporate earnings of the taxpayer shall be that part of the excess revenue not in excess of 6 percent of the par value of the issued and outstanding stock, that the corporate earnings shall be deducted pro rata from the excess revenue derived from the ginning charges and from the sale of cottonseed, and that such corporate earnings shall be declared as an annual cash dividend upon outstanding stock. The balance of the excess revenue remaining after deducting the amount payable for dividends shall be allocated as patronage rebates or discounts payable in cash or by check to stockholders and nonstockholder members. The balance of the excess revenue remaining from ginning and wrapping cotton shall be credited to the stockholders and nonstockholder members in the ratio that the total pounds of cotton ginned for each bears to the total pounds of cotton ginned for all of the stockholders and nonstockholder members, and that part of the excess revenue remaining from trading in cottonseed shall be credited to the stockholders and nonstockholder members in the ratio that the total pounds of cottonseed delivered by each bears to the total cotton seed delivered by all the stockholders and nonstockholder members. It is further provided that, for the purpose of computing the amount of discount or rebate to which each person is entitled, there shall be included in the weights of seed cotton ginned and cottonseed delivered for each, all the cotton grown or controlled by him and ginned at the taxpayer's gin.

Additionally, it is provided that in the event there is a net deficit for any year resulting from either ginning or dealing in cottonseed, such deficit shall be charged to the stockholders and nonstockholder member in the same proportion as is provided for the allocation of patronage rebates.

The membership and patronage agreement which stockholders and nonstock-

holder members were required to sign provided that the agreement should cover all cotton and cottonseed produced or acquired by the patron, and that all cotton and cottonseed produced on the lands of the patrons or lands owned, controlled or operated by them should be prima facie presumed to be the cotton and cottonseed of the patrons.

During the years of its existence, including the taxable year involved ending July 31, 1956, the taxpayer operated in accord with its by-laws.

At all times during the year ending July 31, 1956, all of the taxpayer's stockholders had executed membership and patronage agreements as prescribed in the by-laws, and there were no nonstockholders with patronage agreements with the taxpayer. The taxpayer held itself open to the public to gin cotton, and a part of its business was with nonstockholder nonmembers. The taxpayer charged the standard price for ginning cotton and paid the standard price for cottonseed for both stockholders and nonmembers. While it was under no obligation to rebate anything to nonmembers, in practice it did make a flat rebate of $3 per bale to nonmembers to meet competition.

The taxpayer ginned cotton delivered by tenants of stockholders, and this was entered on the taxpayer's records under the names of the stockholders. However, each ticket indicated the name of the tenant or the particular farm, in order that the landlord could identify the source. One member might have as many as 12 or 15 such sources. When the rebate to which each member was entitled was computed, the member was credited not only with the cotton which he grew and brought to the gin but also with that of his tenants. The rebate was made to the member and not to the tenants. The Tax Court allowed the patronage rebates to the extent attributable to stockholder member business as a deduction or exclusion from the income of petitioner. In its return the petitioner deducted $28,213.92 as representing patronage rebates to such stockholder members, but the Commissioner disallowed $4,361.91 of this amount, holding that to this extent the payment to the stockholders did not represent a rebate on business furnished by them, but was attributable to profit made on nonmember business.

In the case at hand the taxpayer was under a pre-existing obligation contained in its by-laws and membership agreement to pay to its members, in proportion to the business done by each, all of its earnings in excess of an amount representing 6% of the par value of its outstanding stock. It has been permitted to exclude from its gross income, patronage dividends paid to its members derived from earnings from ginning and wrapping cotton, and from trading in cottonseed for its members. But it has been denied to exclude that portion paid to its members which was derived from earnings received from nonmembers business, on the ground that such amounts did not qualify as true patronage dividends. This nonmember business represented 26.47% of the business carried on by the taxpayer with 6.15% being carried on for casual nonmembers and 20.32% being carried on with members' tenants, who in turn were not members of the taxpayer. The taxpayer was not under any obligation to pay patronage dividends to nonmembers and in fact paid dividends on earnings only to members.

It is agreed that taxpayer is not a farmers cooperative organization exempt from tax as provided in Section 521 of the Internal Revenue Code of 1954. Taxpayer is taxable as a corporation organized for profit under the general corporation laws of Mississippi, although having some cooperative features. In the years in question all of taxpayer's income was derived from business with stockholder members and with nonmembers, there being no nonstockholder members.

■■ This taxpayer is a corporation organized for profit. All of its profits, whether from members or nonmember business, constitute income to it, except to the extent that taxpayer was under obligation to make patronage dividends,

refunds or rebates or any portion thereof, Peoples Gin Co. v. Commissioner, (C.A.5) 118 F.2d 72. Of course, if a patronage dividend, refund or rebate is made to patrons, whether stockholders or not, pursuant to an obligation to do so, the amount thereof is not to be included in the petitioner's income, Uniform Printing & Supply Co. v. Commissioner, (C.A. 7) 88 F.2d 75, 109 A.L.R. 966.

Appellant asserts the Tax Court erroneously considered and treated taxpayer as though it was a cooperative type of organization. Under this Court's decision in the case of United States v. Mississippi Chemical Co., 5 Cir., 326 F.2d 569 (1964) it is immaterial whether the cooperative is organized under a special cooperative statute or under general corporation law, the test is the existence of a legally enforceable obligation to pay patronage refunds which existed during the period when such refunds were earned. The obligation may be created by the charter and by-laws or by separate contract. By attempting to include earnings from nonmembers business in its patronage dividends payable only to members, taxpayer has completely misconstrued the law governing what are patronage dividends, patronage rebates or patronage refund excludable from income of the cooperative. The patronage refund must meet the three recognized tests to determine whether payments to member patrons by a cooperative or a corporation with cooperative features are excludable from earnings. These tests are clearly stated by the Court of Appeals for the 8th Circuit in Pomeroy Cooperative Grain Co. v. Commissioner, 288 F.2d 326, quoting the Tax Court in the same case reported in 31 T.C. 686 as follows:

" '1. The allocation must have been made pursuant to a legal obligation which existed at the time the patron transacted his business with the cooperative.

" '2. The allocation must have been made out of profits or income realized from transactions with the particular patrons for whose benefit the allocations were made, and not out of profits or income realized from transactions with other persons or organizations which were not entitled to participate in such allocations.'

" '3. The allocations must have been made equitably; so the profits realized on the one hand from selling merchandise or services to patrons, and those realized on the other hand for marketing products purchased from patrons, were allocated ratably to the particular patrons whose patronage created each particular type of profit.' "

The patronage refund to the members of appellant does not meet these tests.

Appellant cites as authority Peoples Gin Co. v. Commissioner, decided by the Tax Court June 21st, 1943 (PH Memo TC Tar. 43,304). This case is clearly distinguishable from the case at hand. In the case of Peoples Gin Co. there was no relation between the rebates or "Patronage distribution" and a share of the stock held by the stockholder patrons, and the shares of capital stock in no way participated in any of the rebates or "patronage distribution." The capital participated exclusively in the regular dividends paid out of surplus profits or corporation profits from non-stockholder business, but no rebates in the way of "patronage distribution" paid or distributed to any of the stockholders from the corporation profit or surplus. Peoples Gin Co. paid a tax on income derived from its non-stockholder patrons and the profits from this source were agreed to constitute corporate profits distributed as dividends and the taxpayer claimed a deduction only for rebates to its stockholder-patrons based upon the volume of business contributed by them. The other decisions relied upon by the taxpayer are inapposite.

We are in complete accord with the holding by the Court of Appeals for the 8th Circuit in Pomeroy Cooperative Grain Co. v. Commissioner, supra:

"It is well established that profits derived by nonexempt cooperatives from nonmember business are not

entitled to be excluded from the co-operatives' gross income. The patronage dividends to the extent that they were allocated to members out of profits realized from the C. C. C. grain storage were properly denied as exclusions from the cooperative's gross income."

The Tax Court correctly held that amounts paid by the taxpayer to its members derived from business done with nonmembers do not qualify as true patronage dividends and are not excludable from the taxpayer's income.

The decision of the Tax Court is affirmed.