CONTRACTING PLUMBERS COOPERATIVE RESTORATION CORPORATION, Plaintiff-Appellee,

v.

UNITED STATES of America, Defendant-Appellant.

No. 64, Docket 73–1083.

United States Court of Appeals, Second Circuit.

Argued Nov. 12, 1973.

Decided Dec. 13, 1973.

Rehearing and Rehearing En Banc Denied Jan. 23, 1974.

Wesley J. Filer, Atty., Tax Div., Dept. of Justice, Washington, D. C. (Scott P. Crampton, Asst. Atty. Gen., Tax Div., Ernest J. Brown and Leonard J. Henzke, Jr., Attys., Tax Div., Dept. of Justice, Washington, D. C., and Robert A. Morse, U. S. Atty., for the Eastern District of New York, of counsel), for defendant-appellant.

Robert N. Cooperman, New York City (Kuh, Goldman, Cooperman & Levitt, New York City, Peter Lushing, of counsel), and Kadel, Wilson & Potts, New York City (Abraham Wilson, New York City, of counsel), for plaintiff-appellee.

Before KAUFMAN, Chief Judge, and SMITH and OAKES, Circuit Judges.

J. JOSEPH SMITH, Circuit Judge:

This is an appeal by the government from a determination by the District Court for the Eastern District of New York, Mark A. Costantino, *Judge,* that taxpayer is exempt as both a "civic organization," 26 U.S.C. § 501(c)(4), and a "business league," 26 U.S.C. § 501(c)(6). While we believe that taxpayer's activities are totally commendable, we nevertheless find that Congress has imposed certain limitations on those two exemptions and that taxpayer simply does not qualify. We therefore reverse.

I.

Taxpayer's sole purpose is .to insure the efficient repair of "cuts" made in the streets of New York City by its members in the course of their plumbing activities. Prior to taxpayer's formation, city employees had repaired such cuts, billing the responsible plumber accordingly. But this municipal restoration program was highly inefficient, subjecting the community to the dangers of—and the plumbers to corresponding liability for—improperly filled excavations for prolonged periods.[1] Moreover, this inefficient program was resulting in an annual operating loss to the city —after reimbursement by the plumbers —of approximately $2 million.

By 1967 this unsatisfactory arrangement had deteriorated to the point that the plumbers were threatening to sue the city to limit their liability, and the city, in turn, was threatening to burden the plumbers with most of the $2 million annual loss. The plumbers therefore

---

1. The Deputy Highway Commissioner assigned to the problem testified that the cuts were generally left unrepaired for eight to ten months.

proposed that they conduct their own restoration program through a private, non-profit cooperative. The city, undoubtedly overjoyed, agreed with the stipulation that the cooperative make all repairs within thirty days.

In what must surely be a tribute to the private sector, taxpayer has performed more efficiently than even its founders had expected: By promptly assigning the repair work to private contractors and scrupulously monitoring its completion, taxpayer has reduced the average restoration time to approximately fourteen days. Perhaps even more startling, in 1968—the tax year in question—taxpayer not only did not lose $2 million in charging its members the same price the city had been exacting, but actually turned a modest profit of $5239—the taxable income at issue.[2]

## II.

Relying on taxpayer's non-profit nature, its public origins, and its undisputed benefit to the people of New York, the district court held that taxpayer was exempt as a "civic . . . organization not organized for profit but operated exclusively for the promotion of social welfare. . . ." 26 U.S.C. § 501(c)(4). The court noted that this statutory definition has been significantly liberalized by regulations providing:

An organization is operated exclusively for the promotion of social welfare if it is primarily engaged in promoting in some way the common good and general welfare of the people of the community. [§ 1.501(c)(4)–1(a)(2)]

The district court then found that the taxpayer's value to the community and to its individual members was "indistinguishable," and that therefore the organization was tax-exempt. We cannot agree. Rather we adhere to the rule that the presence of a single substantial non-exempt purpose precludes exempt status regardless of the number or importance of the exempt purposes. People's Educational Camp Society, Inc. v. Commissioner, 331 F.2d 923, 931 (2d Cir.), cert. denied, 379 U.S. 839, 85 S.Ct. 75, 13 L.Ed.2d 45 (1964); American Women Buyers Club, Inc. v. United States, 338 F.2d 526, 528 (2d Cir. 1964). *See also*, Better Business Bureau of Washington, D. C., Inc. v. United States, 326 U.S. 279, 283, 66 S.Ct. 112, 90 L.Ed. 67 (1945); Commissioner v. Lake Forest, Inc., 305 F.2d 814, 820 (4th Cir. 1962).

In applying this standard, we think at least four factors are relevant. First, we must look to the formative history of the organization. Here the plumbers' open disenchantment with both prolonged liability and the threat of increased restoration costs[3] clearly suggests that they had a substantial business interest in taxpayer's formation.

Second, we have the embodiment of that completely legitimate, but nevertheless private, interest in the taxpayer's bylaws:

The purposes for which the Corporation is formed are to operate and maintain . . . in coordination with the Department of Highways . . . a program . . . for rendering mutual help and service to the Corporation's members by arrang-

---

2. This minimal profit represented slightly more than 1% of the $433,762 that the taxpayer charged its members. Pursuant to taxpayer's by-laws, this profit was distributed to tax-exempt groups promoting the plumbing industry.

3. The government further contends that many members—notably the smaller operators—have also benefited by the fact that taxpayer reduced the minimum restoration fee from $67.50 (for three cubic yards of

fill) to $45.00 (for two yards). Taxpayer strenuously disputes the significance of this reduction.

We find it unnecessary to ascertain the precise extent of these theoretical savings, since they in any event pale before the far more substantial savings occasioned by taxpayer's efficient operation. Most notably, in 1968 taxpayer charged its members $433,672 for repairs that would have cost the city— and almost inevitably the plumbers—an estimated $2.5 million.

ing for the repaving or replacement of streets, curbs, and sidewalks required to be repaved or replaced by the members of the Corporation. . . .

While such a statement is not conclusive, Consumer-Farmer Milk Cooperative v. Commissioner, 186 F.2d 68, 70 (2d Cir. 1950), cert. denied, 341 U.S. 931, 71 S. Ct. 803, 95 L.Ed. 1360 (1951), we nevertheless think it is probative as to the taxpayer's non-exempt purpose of mutual aid.

Third, we have the taxpayer's actual operation. Here there can be no doubt that the cooperative is of tremendous value to the private economic interests of its members—a clearly non-exempt purpose. Consumer-Farmer Milk Cooperative v. Commissioner, 186 F.2d 68, 71–72 (2d Cir. 1950), cert. denied, 341 U.S. 931, 71 S.Ct. 803, 95 L.Ed. 1360 (1951); Commissioner v. Lake Forest, Inc., 305 F.2d 814, 820 (4th Cir. 1962). The members now have far less liability at a price considerably lower than that which almost certainly would have developed under the former, municipal system. Conversely, it must be remembered that the taxpayer has never followed the "social welfare" into repairing the equally troublesome potholes left by the few remaining nonmember plumbers [4] or the other, more numerous, enterprises that burrow into the city streets.[5]

Finally, we have the fact that each member of the cooperative enjoys these economic benefits *precisely* to the extent that he uses, and pays for, its restoration services. It is this conditional benefit that most distinguishes this case from Monterey Public Parking Corporation v. United States, 321 F.Supp. 972 (N.D.Cal.1970), aff'd, 481 F.2d 175 (9th Cir. 1973)—a district court opinion stressed by both the taxpayer and the court below. In *Monterey* the court held that a private, non-profit parking lot financed by local merchants was exempt under § 501(c)(4)—but only because its organizers had not exploited the facility "by giving themselves special advertising rights, or by restricting the validation stamp system to certain businesses. . . . " *Id.* at 975. The court recognized that such limitations would have demonstrated that the merchants "were in fact primarily interested in their own ends rather than those of the public. . . . " *Id.*

Thus, to the extent we might be inclined to agree with *Monterey's* suggestion that "indistinguishable" public and private benefits satisfy the exemption,[6] that theory is inappropriate here where the private benefit to each member is so much more precise.

In sum, we find that the taxpayer provides substantial and different benefits to both the public and its private members, and that we therefore cannot say that it is "primarily" devoted to the common good as required by even the most liberal reading of § 501(c)(4).

---

4. Not surprisingly, participation by licensed city plumbers has increased from 85% in 1968 to 98% today.

5. In November of 1972, the city established a color code to indicate responsibility for improperly filled excavations. In addition to the taxpayer, the private subway, telephone and utility companies were required to join the city traffic, water and sewer agencies in so labeling their cuts. N.Y. Times, November 26, 1972 at 84, col. 3. However, enforcement of the code has been difficult (N.Y. Times, February 5, 1973 at 33, col. 1), and the "pothole problem" remains: One city councilman recently complained that the streets of his borough were akin to the "Burma Road." N.Y. Times, May 21, 1973 at 27, col. 7.

6. This dictum in *Monterey* may not have survived the Ninth Circuit's guarded affirmance:

The District Court made a quantitative comparison of the private versus the public benefits derived from the organization and operation of the plaintiff corporation. Thereby, it was determined that the "social welfare" and "charitable purpose" requirements of the two respective sections were adequately fulfilled. We cannot disagree.

481 F.2d 175, 177 (9th Cir. 1973). We would, of course, agree on such an explicit comparison of distinct public and private purposes.

### III.

Much of the above is relevant to the district court's conclusion that taxpayer is also exempt as a "business league." 26 U.S.C. § 501(c)(6). Here the relevant regulations provide:

> A business league is an association of persons having some common business interest, the purpose of which is to promote such common interest and not to engage in a regular business of a kind ordinarily carried on for profit. . . . Thus, its activities should be directed to the improvement of business conditions of one or more lines of business as distinguished from the performance of particular services for individual persons.
>
> [§ 1.501(c)(6)–1]

In holding the taxpayer so exempt, the district court again relied on the fact that it is neither organized for profit nor engaged in a traditionally profit-motivated activity. While we agree with these findings, we believe that they only partially satisfy the exemption. Rather we find that taxpayer has failed to prove that its primary purpose is "the improvement of business conditions . . . as distinguished from the performance of particular services for individual persons."

While all plumbers may receive some small, incidental benefit from the goodwill of a community no longer subjected to their improperly filled excavations, each individual member receives far more in economic terms precisely to the extent that he uses the restoration service. In Evanston-North Shore Board of Realtors v. United States, 320 F.2d 375, 378–379, 162 Ct.Cl. 682 (1963), cert. denied, 376 U.S. 931, 84 S. Ct. 700, 11 L.Ed.2d 650 (1964), the court emphasized just such proportional benefit as the most important factor demonstrating that a multiple listing system operated by member realtors was not exempt under § 501(c)(6). The court below attempted to distinguish *Evanston-North Shore* on the grounds that while there the listing service was related to the underlying sale of real estate, here the restoration service involved only the plumbers themselves. We find this unpersuasive. Rather we believe that the regulations and *Evanston-North Shore* are directed towards a realistic economic analysis of the benefits derived by the members of the organization. Where, as here, those individual benefits are precisely proportional to the member's financial involvement in the organization, the fundamentally non-exempt purpose of providing a necessary service at reduced cost becomes too clear to be ignored.

Reversed.