MICHIGAN MOBILE HOME AND RECREATIONAL VEHICLE INSTITUTE, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 9097-74. Filed July 27, 1976.

*William I. Althen,* for the petitioner.
*James E. Keeton, Jr.,* for the respondent.

OPINION

TANNENWALD, *Judge:* Respondent determined the following deficiencies in petitioner's Federal income taxes:

| TYE June 30— | Deficiency |
|---|---|
| 1971 | $34,714.06 |
| 1972 | 33,224.85 |

The issues before us are: (1) Whether petitioner qualified as an organization exempt from taxation under section 501(c)(6)[1] during the years in question and (2) if petitioner did not so qualify, whether that portion of petitioner's net proceeds from the sponsorship of a trade show during each of the years in question which petitioner distributed to its members who exhibited at such show as exhibition space rent rebates was excludable or deductible from petitioner's income.

The parties have submitted this case fully stipulated pursuant to Rule 122, Tax Court Rules of Practice and Procedure. The stipulation of facts and the exhibits so submitted are incorporated herein by this reference.

Petitioner Michigan Mobile Home & Recreational Vehicle Institute is a Michigan corporation maintaining its principal office in Livonia, Mich. Petitioner was organized in 1962 as a nonprofit, nonstock corporation under the name of Michigan Mobile Home Association, Inc., which was changed in 1969 to petitioner's present name.[2]

Petitioner's purposes, as stated in its articles of incorporation and bylaws, are as follows:

To promote the general welfare of the entire Mobile Home Industry; to provide information valuable to the Industry; to develop highest business practices and to combat unduly restrictive regulations on any part of the Industry; to maintain a clearing house for all available information in the

---

[1] All section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years in question.

[2] The precise name change was to "Michigan Mobile Home & Recreational Vehicle Institute, *Incorporated.*" (Emphasis added.) See Jt. Ex. 1-A. Neither the statutory notice, pleadings, nor briefs filed herein contain the emphasized word. Moreover, they utilize the word "and" instead of the ampersand.

Industry, and to conduct surveys and studies from time to time to keep the membership advised of the status of the Industry;

To do anything necessary and proper for the accomplishment of the foregoing or other proper and lawful objectives of the Association.

The bylaws also provided:

In the event of the dissolution of this Institute, all funds shall be disbursed to one or more similar non-profit organizations at the discretion of the Board of Directors.

On October 1, 1963, respondent issued a letter determination that petitioner was exempt from Federal income tax under section 501(c)(6). For each of the years in question petitioner filed a Form 990 return as an organization exempt from income tax.

Membership in petitioner was limited to "Mobile Home, Manufactured Housing, and/or Recreational Vehicle Dealers, Park Operators, Manufacturers, Suppliers, Special Service Firms, and Associates" who paid an "initiation fee" as well as annual membership dues which generally ranged from $50 to $300 per member. For the fiscal years ended June 30, 1971, and June 30, 1972, petitioner had approximately 700 members and collected dues of $58,448.70 and $62,408.64, respectively.

For several years petitioner was involved in the annual Detroit Camper and Travel Trailer Show (hereinafter the show). From 1968 until 1971, the show was operated by HMR, Inc., a for-profit corporation, under an agreement with petitioner whereby petitioner agreed to sponsor and assist in the operation, HMR, Inc., assumed responsibility for any losses, and the profits were to be divided equally among HMR, Inc., petitioner, and the show's exhibitors, each of whom would be entitled to a pro rata portion of the exhibitors' share based upon the cost of his exhibition space. The show was successful in each of the years covered by the contract and profits were distributed accordingly. Negotiations between petitioner and HMR, Inc., to renew the contract failed and, in 1970, petitioner assumed responsibility for the annual show beginning with the show scheduled for February 1971.

In July 1970, petitioner's committee in charge of the show proposed to petitioner's board of directors the following plan for the distribution of the show's net proceeds:

40 percent— to the member-exhibitors with
each member-exhibitor's share
prorated on the basis of the

> amount of space he rented at
> the show
>
> 40 percent— to petitioner for promoting
> its programs
>
> 20 percent— to a reserve fund for future
> shows

On July 22, 1970, the board accepted such plan pending the receipt of an appropriate opinion of counsel. Subsequently tax counsel advised that, while the operation of a trade show, per se, would not cause petitioner to lose its tax-exempt status, the distribution of rebates to only those exhibitors who were members of petitioner could constitute a proscribed inurement of benefits to the recipient members, since they would be receiving a portion of amounts paid by nonmember-exhibitors as well as a reduction of their own costs.

Exhibition space for the February 1971 and 1972 shows was rented to members and nonmembers at the same rates. As of its March 11, 1971, meeting, petitioner's board of directors was able to determine that the 1971 show had yielded substantial profits, although all bills had not yet been paid and the final financial report of the show had not yet been submitted. At this meeting, the board approved the distribution of rebates to each member-exhibitor amounting to 20 percent of the amount such member paid for the rental of space at the show. Remaining proceeds were to be held in reserve.

Petitioner realized the following amounts from the 1971 show:

| Gross receipts: | |
|---|---:|
| Space rental (before any rebates) _____ | $142,585.00 |
| Admission tickets _____ | 127,542.00 |
| Concessions and miscellaneous _____ | 13,623.64 |
| | 283,750.64 |
| Less: | |
| Loss on sale of patches _____ | (993.21) |
| Expenses _____ | (175,635.29) |
| Net proceeds_____ | 107,122.14 |

After the receipt and approval of the final financial report of the show and the settlement of all accounts, amounts were distributed to member-exhibitors, calculated as follows:

Net proceeds _____ $107,122.14
40 percent of net proceeds _____ 42,848.86
    Rounded to _____ 42,775.50
Relationship of 40 percent of net proceeds to
    total space rental receipts:

$$\frac{\$42,775.50}{\$142,585.00} = 30 \text{ percent}$$

Distribution to each member-exhibitor of
    30 percent of his space rental cost[1] _____ 33,057.00

---

[1] Before offset for advance rebate.

Petitioner retained the remaining portion of the 40 percent of net proceeds allocable to the rental receipts from nonmember-exhibitors over total space rental receipts, or $9,718.50.[3]

Prior to the February 1972 show, the board of directors again decided that net proceeds, if any, from such show would be divided so that 40 percent would be rebated to member-exhibitors, 40 percent would be retained by petitioner, and 20 percent would be held in reserve for future shows. Petitioner realized the following amounts from the 1972 show:

Gross receipts:
    Space rental (before any rebates) _____ $140,185.00
    Admission tickets _____ 162,395.97
    Concessions and miscellaneous _____ 17,605.44
                                         320,186.41

Less:
    Expenses _____ (196,593.59)
Net proceeds_____ 123,592.82

The same procedure was followed in respect of rebates for the 1972 show. On April 19, 1972, before the final figures had been tallied, a rebate of 20 percent of his space-rental cost was approved by the board of directors and made to each member-exhibitor. After the final report of the show was received and approved and all bills were paid, final rebates were calculated as follows:

---

[3] The allocation and distribution to member-exhibitors and the retention by petitioner of the portion allocable to nonmember-exhibitors varied the formula adopted by the board of directors on July 22, 1970. The record contains no minutes approving such variation, but the stipulation implies that such approval occurred. Moreover, the record does not indicate when such allocation and distribution was made, but we infer that it was accomplished prior to the close of petitioner's fiscal year ended June 30. In any event, the parties have raised no issue in respect of this possible gap in the record, which might involve the question of cash versus accrual basis of reporting.

Net proceeds _____ $123,592.82
40 percent of net proceeds _____ 49,437.13

Relationship of 40 percent of net proceeds to
   total space rental receipts:

$$\frac{\$49{,}437.13}{\$140{,}185.00} = 35.26 \text{ percent}$$

Distribution to each member-exhibitor of
   35.26 percent of his space rental cost[1] _____ 40,252.00

---

[1] Before offset for advance rebate.

Petitioner retained the remaining portion of the 40 percent of net proceeds allocable to the rental receipts from nonmembers over total space rental receipts, or $9,185.13.[4]

More than half of the individual rebates made to member-exhibitors after each show were substantially in excess of $300, which amount was the upper limit of annual dues paid by members.

On its Form 990 returns for the taxable years ended June 30, 1971, and June 30, 1972, petitioner omitted from its statement of "Trade Show Income" the amount of net proceeds rebated to its members. Respondent determined that, because of petitioner's distribution of "rebates," petitioner failed to qualify as a tax-exempt organization and further that the amount of proceeds distributed to member-exhibitors was neither excludable nor deductible from petitioner's income.

Section 501(c)(6) defines as tax-exempt organizations business leagues "not organized for profit and no part of the net earnings of which inures to the benefit of any private shareholder or individual."

Although respondent adverts to the possibility that petitioner may not have satisfied more than one of the requirements of the statute and the regulations which an organization must meet to qualify as an exempt business league (see *American Automobile Association,* 19 T.C. 1146, 1158 (1953)), he rests his contention as to petitioner's exempt status solely on the ground that petitioner's distributions of trade show proceeds inured to the benefit of the member-exhibitor recipients and, therefore, constituted a proscribed inurement of benefits to private individuals. Such being the case, according to respondent, the rebates to member-

---

[4] See n. 3 *supra.*

exhibitors constituted nondeductible distributions of earnings and profits, i.e., dividends. Petitioner counters with the assertion that the rebates were adjustments to the price of exhibition space for its members and merely constituted a permissible price differential between the cost of space to members and non-menbers which did not affect its exempt status and that, in any event, they should be characterized as an offset to its taxable income should we hold that petitioner was not an exempt organization during the taxable years in question.

We direct our attention in the first instance to the question of petitioner's exempt status. In determining whether net earnings inure to the benefit of private individuals each case stands on its own facts. *Associated Industries of Cleveland,* 7 T.C. 1449, 1468 (1946). The concept of inurement of benefits is not limited to cash dividends. See *Founding Church of Scientology v. United States,* 412 F.2d 1197, 1200 (8th Cir. 1969). In *American Automobile Association, supra,* we found net earnings inuring to the benefit of private individuals where an organization extended its services to its membership for less than the cost of the same services elsewhere. Cf. *Contracting Plumbers Coop. Restor. Corp. v. United States,* 488 F.2d 684, 687-688 (2d Cir. 1973); *Evanston-North Shore Board of Realtors v. United States,* 320 F.2d 375 (Ct.Cl. 1963). And in *Stanford University Bookstore,* 29 B.T.A. 1280, 1283 (1934), affd. 83 F.2d 710 (D.C. Cir. 1936), rebates by a cooperative college bookstore to all purchasers (both members and nonmembers) who turned in purchase receipts, payable from its profits as the directors saw fit, furnished an independent basis for the denial of tax-exempt status on the ground that such rebates constituted an impermissible inurement of benefits to private individuals.

In the instant case, the impermissible inurement of benefits to private individuals is even clearer in that the rebates were made to member-exhibitors and not to nonmember-exhibitors.[5] Whatever the reach of *American Automobile Association, supra,* and *Stanford University Bookstore, supra,* such discriminatory rebates fall within their ambit.

---

[5] The amounts allocated to nonmember-exhibitors were retained by petitioner. See pp. 774 and 775 *supra.* Respondent has not raised the inurement issue in respect of these amounts, presumably because of the provisions relating to the distributions of petitioner's assets on dissolution. See p. 772 *supra.* Compare *Crooks v. Kansas City Hay Dealers' Assn.,* 37 F.2d 83, 87 (8th Cir. 1929), with *Stanford University Bookstore,* 29 B.T.A. 1280, 1283 (1934), affd. 83 F.2d 710 (D.C. Cir. 1936).

Petitioner seeks to justify the rebates to member-exhibitors on the ground that its members bore the cost of its continuing operations and that petitioner's general funds, composed of members' fees and dues, bore the risk of the trade show's financial failure. In effect, petitioner argues that its distributions leveled the costs borne by members and nonmembers. In support of its contention, petitioner refers us to *Glass Container Industry Research Corp. v. United States,* an unreported case (W.D. Pa. 1970, 25 AFTR 2d 70-537, 70-1 USTC par. 9214), in which the District Court expressed its view that an organization formed for the purpose of engaging in a cooperative research effort, which was funded by membership dues, need not have provided to the public free of charge the fruits of its research in order to qualify for tax exemption. The particular taxpayer, because of the nature of its activities, was held not to be a tax-exempt business league. We do not agree with petitioner that the court's gratuitous language establishes the right of an exempt organization to charge nonmembers a higher price than it charges members for the same product or service. Rather, the language simply suggests that what members pay for by way of dues need not be given to others gratis. Moreover, we would question the soundness of the District Court's observation even if petitioner's interpretation were correct.

We find no merit to petitioner's contention that, because its members support its other activities, they should pay less to exhibit at the show. Petitioner's general funds were never intended to be applied to the show and never were so applied. And, even if they were so applied, we find no justification for reimbursing certain sums only to those members who exhibited at the show in proportion to the amount of exhibit space they rented, to the exclusion of nonexhibiting members. Moreover, it appears from the record that a substantial number of the distributions to members were far in excess of the maximum annual dues—an element which seriously undermines the factual basis for petitioner's contention.

In sum, we think it clear that, however the rebates to member-exhibitors are characterized, whether as adjustments to their rental charges or as distributions of earnings, petitioner simply cannot pass through the portals of section 501(c)(6) for the

taxable years involved herein.[6]

Having concluded that petitioner was subject to income tax, we now turn to the tax treatment of that portion of trade show proceeds paid out to petitioner's member-exhibitors. At the outset, we reject petitioner's contention that a decision that the rebates constituted an impermissible inurement of benefits so as to deprive petitioner of its tax-exempt status necessarily results in a determination that the amount of those rebates was either not income or an allowable deduction. Such a bootstrap contention is without merit.

The guidelines for analysis have been stated as follows in *Smith & Wiggins Gin, Inc. v. Commissioner*, 341 F.2d 341, 349-350 (5th Cir. 1965), affg. 37 T.C. 861, 880 (1962):

All [the taxpayer's] profits, whether from members or nonmember business, constitute income to it, except to the extent that taxpayer was under obligation to make patronage dividends, refunds or rebates or any portion thereof, Peoples Gin Co. v. Commissioner, (C.A. 5) 118 F.2d 72. Of course, if a patronage dividend, refund or rebate is made to patrons, whether stockholders or not, pursuant to an obligation to do so, the amount thereof is not to be included in the petitioner's income, Uniform Printing & Supply Co. v. Commissioner, (C.A. 7) 88 F.2d 75, 109 A.L.R. 966.

See also *Associated Grocers of Alabama v. Willingham*, 77 F.Supp. 990 (N.D. Ala. 1948).

Petitioner argues that its obligation to pay rebates was established by board resolution prior to each show and the collection of exhibition fees therefor so that the amounts distributed never became part of its gross income. The pre-1971 show resolution regarding the distribution of 40 percent of net show proceeds to member-exhibitors, however, was expressly

---

[6] In so holding, we are not unmindful of the admonition in *Texas Mobile Home Association v. Commissioner*, 324 F.2d 691 (5th Cir. 1963), revg. T.C. Memo. 1962-95, that we should not blindly apply strict rules and overlook "the weightier things of the applicable law." We think the nature and the substantiality of the benefits involved herein were more than incidental and clearly not the type which Congress would have us ignore. Nor do we think that our application of sec. 501(c)(6) herein is so strict as to deny exemption to those organizations which Congress intended to exempt from taxation. Cf. Bittker & Rahdert, "The Exemption of Nonprofit Organizations from Federal Income Taxation," 85 Yale L.J. 299, 355-356 (1976). Moreover, the broader perspective advocated by the Fifth Circuit in passing on exemption qualification derives in large part from *Trinidad v. Sagrada Orden*, 263 U.S. 578, 579 (1924), where the parties stipulated that no part of net earnings was applied for the benefit of any private individual or shareholder and where the Court concerned itself only with the organization's purpose and operation. Compare *Spokane Motorcycle Club v. United States*, 222 F.Supp. 151 (E.D. Wash. 1963), and *Northwestern Jobbers' Credit Bureau v. Commissioner*, 37 F.2d 880 (8th Cir. 1930), affg. 14 B.T.A. 362 (1928).

contingent upon the securing of advice of legal counsel who subsequently questioned the rebate plan. We have no evidence before us of any board action subsequent to receipt of counsel's opinion and prior to the 1971 show. Given the failure of the condition upon which board adoption of the resolution depended, as well as the fact that the actual distribution plan differed significantly from the intended distribution plan, we conclude that petitioner had no preexisting obligation to rebate any portion of its 1971 show proceeds and therefore cannot exclude from gross income the amount so distributed.

The same result obtains in respect of the distribution from the 1972 show proceeds. The record contains no documentary evidence of any corporate action regarding a rebate program prior to the 1972 show. Petitioner relies on the fact that the parties stipulated that prior to the 1972 show the petitioner's show committee and board agreed that 40 percent of the show's net profits would be distributed to member-exhibitors. However, we have no evidence that such "agreement" rose to the level of a resolution or any other similar action sufficient to create an enforceable obligation. In fact, a brochure publicizing the 1972 show stated in part as follows:

Show Space Cost Rebate

Based on the success of the exhibition, a rebate as a percentage of show space costs shall be made to some and/or all exhibitors. *The amount, method of payment, time of payment, determination of eligibility for rebate and other details of the rebate shall be determined by the Show Management and the sponsoring organization.*

Notice: Rebates shall be limited to exhibitors who are members in good standing of Michigan Mobile Home & Recreational Vehicle Institute as of January 19, 1972.

[Emphasis added.]

We think the foregoing, coupled with the fact that the actual distribution plan differed from that accepted by the board and the committee, suggests that petitioner had no more than a general intent to make rebates. Absent any preexisting obligation to return a portion of the proceeds it received, all such proceeds for 1972 constituted gross income to petitioner.

The distribution of show profits by petitioner pursuant to board action after the receipt of show proceeds is similar to the distribution of profits based on stockholder patronage in *Peoples Gin Co.,* 41 B.T.A. 343, 347-348 (1940), affd. 118 F.2d 72 (5th Cir. 1941), where it was held:

Such a distribution constitutes the payment of a dividend and is not deductible in determining the petitioner's net income. The fact that the profits were distributed to stockholders on some basis other than the stock held by each stockholder does not make the distribution any the less a dividend. [Citations omitted.]

See also *Cleveland Shopping News Co. v. Routzahn,* 89 F.2d 902 (6th Cir. 1937).

In view of the foregoing, we conclude that petitioner's distributions were neither excludable nor deductible.[7]

*Decision will be entered under Rule 155.*[8]

---

[7] Neither party having raised the issue, we express no opinion as to whether the provisions of subch. T, Cooperatives and Their Patrons, have any impact on this conclusion.

[8] This procedure will afford the parties the opportunity to make such motions as they deem appropriate to amend the caption of this case. See n. 2 *supra.*